AMARILLA B. MULVEY

*v.*

JOSEPH GIBBONS *et al.*

1. BURNT RECORD—*when court may determine title.* The statute known as the "Burnt Record act" provides for two sorts of petitions,—one to establish title, and the other to establish any lien by mortgage, etc. Where the petition is to establish title which is claimed by both parties, the court is empowered to inquire into the condition of any title or interest in the land, and to determine in which party is the title or interest, legal or equitable, and declare the same by decree.

2. Where the petitioner claims to have derived title through a mortgagee of the land, and the defendant through the mortgagor, and the latter denies that the equity of redemption has been foreclosed, it becomes a proper question for the court to decide whether the equity of redemption is enforceable, or is barred by foreclosure, *laches* or other equitable grounds. If not enforceable, it will leave the title in the party succeeding to the rights of the mortgagee.

3. DECREE—*who bound by.* A decree of foreclosure of a mortgage against the mortgagor will not affect one holding the equity of redemption by conveyance who is not made a party to the suit.

4. UNKNOWN PARTY—*who so regarded.* One who is made a party to a bill to foreclose a mortgage, which is afterwards dismissed by the complainant on reversal of the decree, and who resides in the county when a second bill of foreclosure is filed, can not be made a party under the designation of an unknown person. Such a person is not the description contemplated by the statute.

5. SALE UNDER POWER IN MORTGAGE—*for mortgagee's own benefit.* The fact that property sold by the mortgagee under a power of sale, is bid in indirectly for the mortgagee himself, does not render the sale void, but voidable only, at the option of the mortgagor, to be determined in apt time.

6. ADMISSION—*by allegations of bill.* Where a party, in his bill to foreclose a mortgage, gives as a reason for equitable relief, that a prior sale by him under a power was invalid, as the property was bid in by his son for him, and because he executed the deed to his son in his own name, instead of acting as the attorney of the mortgagor, which bill is afterwards dismissed, the statements will be *held* as only those of a legal conclusion, and can have no greater effect than an admission that the property was bid in for the mortgagee.

7. POWER OF SALE—*defective execution as to name of grantor in deed.* Where a mortgage provides for a sale of the premises by the mortgagee on default of payment, and that the mortgagee, on a sale, as the attorney of the mortgagor, may make and execute deed, etc., a deed in the mortgagee's name only, may be regarded as not conveying a good title in fee simple at law, but it will pass an equity to the grantee.

8. PURCHASERS—*whether affected by reversal.* A person purchasing land with reference to the filing of a bill by his vendor to foreclose a mortgage given to him by a prior purchaser, buys the same as *pendente lite*, and will be affected by a reversal of the decree of foreclosure; but a purchaser from him after decree of foreclosure, and before a writ of error is sued out to reverse the decree, will not be affected by its reversal, in the rights acquired by his purchase.

9. JURISDICTION—*from finding in decree.* Where a decree finds there was due service of process upon a defendant, although the summons issued three terms before showed a defective service, it will be presumed in favor of the finding that another summons was issued and served properly.

10. DECREE—*certainty as to amount found due.* A decree of foreclosure find-ing there was due and owing on the notes from the defendant to the complain-ant, "*over* and *above* the sum of" $45,000, is sufficiently certain as to the sum due,—that it was $45,000.

11. STRICT FORECLOSURE—*whether second decree is necessary, showing failure to pay.* Where a decree of strict foreclosure was only a decree *nisi*, barring the equity of redemption if the sum found due was not paid within thirty days, and there was no final order finding a failure to pay and confirming the title, this court, without determining whether such final order of confirmation was necessary, *held*, that the decree, in its bearing upon the equities of the case, was sufficient to avail the party claiming under it, in connection with the delay of the holder of the equity of redemption in asserting any claim, and his neglect for a long time to make any offer to redeem, and that the title thus acquired should be recognized in equity.

12. MORTGAGE—*when equity of redemption will not be enforced.* If a defective foreclosure of a mortgage has been had, the equity of redemption will not be allowed to be asserted against a superior equity, nor will it be allowed under circumstances which show it to be inequitable. Where a mortgage was sought to be foreclosed, and it was thought by all the parties that the foreclosure was good, and the holder of the equity of redemption abandoned the premises, and all claim, supposing it lost, never paid any taxes, or offered to redeem until after a series of years, when the property had passed through many hands for full value, and had become valuable, it was *held*, that the equity of redemption could not be enforced.

APPEAL from the Circuit Court of Cook county; the Hon. W. W. FARWELL, Judge, presiding.

The appellant, Amarilla B. Mulvey, on April 9, 1874, filed a petition under the Burnt Record act, Rev. Stat. 1874, p. 838, against the appellees, to establish title to the premises described in the petition, being part of the north half of the north half of the north-west quarter of the north-west quarter of section 15, town 38 north, range 14 east, in Cook county, in this State, situate about six miles south from the court house in the city of Chicago.

The decree rendered by the court below, and now com-plained of, found that the title to the property was " vested in the lawful grantees and assigns of Jesse Embree, (not naming them,) and not in the petitioner," and dismissed the petition with costs.

24—87 ILL.

The Wiltberger family, consisting of Joseph W. Wiltberger and his children by his deceased wife, Amelia, in 1857, and previously, owned 120 acres of land in said section 15, to-wit: the west half of the north-east quarter, and the north half of the north half of the north-west quarter, of the same. The title, which was found by the decree to be in the lawful grantees and assigns of Jesse Embree, had its origin in a warranty deed of said tract of 120 acres to said Embree, made by Joseph W. Wiltberger, and some of his children, in November, 1858, for the consideration of $94,550. At the same time a mortgage was given back by Embree to Joseph W. Wiltberger, to secure $91,200 of the purchase money. No money has been paid or tendered on the mortgage since the year 1859.

In October, 1865, Joseph W. Wiltberger made a warranty deed of the west half of the north half of the north half of the north-west quarter of section 15, above, to Caroline A. Cleaver, and under her the petitioner derives her claim of title to the land now in question.

A more particular detail of the facts, as show by the record, is, that one Macy, being vested with the legal title to the above 120 acres of land, deeded the same, June 21, 1852, to Amelia, wife of Joseph W. Wiltberger. She died in September, 1852, leaving six children by the said Joseph. He was the owner, by resulting trust, of one-half the property. In 1856, and the early part of 1857, the three children then of age quitclaimed to their father one-half of their interest in the land, so as to vest in him, to that extent, the legal title to his half thereof.

In July, 1857, the property was contracted to be sold by Wiltberger to George W. Yerby, for $96,000, on the terms of $4800 down, and that amount annually for nine years, and at the end of the tenth year, $48,000. Yerby paid $3000, and the odd $1800 was thrown off.

In November, 1858, the said Jesse Embree took Yerby's place, the deed being made to him. A general warranty deed

of the property ·was then made to Embree by Joseph W. Wiltberger, the father, and the three children then of age. In this deed Joseph W. Wiltberger also professed to act as guardian for his three minor children, and to convey on their behalf. The consideration named in the deed is $94,550. Embree gave back to Joseph W. Wiltberger a mortgage to secure the deferred payments, in all $91,200.

The mortgage secures the payment of nineteen notes, of even date therewith, eighteen of them being for $2400 each; two of them being payable on January 1, 1859, and two on the first day of January in each year thereafter, up to and including January 1, 1867. The nineteenth note is for $48,000, payable, conditionally, on January 1, 1868,—that is, conditioned upon the ratification of the sale by the three minor heirs, to be paid then, if they had ratified the sale; if not, thereafter when they should do so.

The mortgage provided that, in case of default in any payment, then the whole sum remaining unpaid should immediately become due and payable as in the notes expressed, and the mortgage might be immediately foreclosed to pay the notes, or sale might be made under the mortgage, it giving to the mortgagee a power of sale in default of payment.

Embree paid no money when the deeds were made, but paid one or two thousand dollars afterward, within about a year; in 1859 two payments, of about $1100 and $600, were made, by purchasers under Embree, making, in all, some $7000 paid, altogether, on the purchase money. No further payments were ever made on the mortgage. In 1857, Yerby made, and had recorded, a subdivision of the land, and threw up streets, but nothing else was ever done on the land by Yerby, Embree, or any of their grantees.

In June, 1862, Joseph W. Wiltberger, for default in payment of the mortgage moneys due, exercised the power of sale given in the mortgage, and sold at public auction and conveyed the property to his son Egbert, on June 10, 1862, at the price of $16,000 for the forty-acre tract, which was first

sold, and $32,000 for the eighty-acre tract, which was also then. next sold. On September 4, 1862, for the expressed consideration of $48,000, Egbert conveyed the property back to his father.

The deed from the Wiltbergers to Embree passed the legal title to one-half the property, and the equitable title to an additional one-fourth, by reason of the resulting trust in favor of Joseph W. Wiltberger. The three minor children quit-claimed to their father as fast as they became of age; one doing so on February 4, 1863; one on January 13, 1865; and the other on November 5, 1866.

On October 3, 1865, Wiltberger filed a bill in chancery, in the Superior Court of Chicago, for the foreclosure of the mortgage, whereon a decree of strict foreclosure was rendered June 18, 1866, the record whereof was brought to this court on writ of error, the transcript of the record being filed August 23, 1869, and such decree of foreclosure was reversed by the judgment of this court, entered May 22, 1871. The cause having been remanded to the Superior Court, afterwards, in that court, and before the present suit was brought, the complainant dismissed his bill of foreclosure without prejudice.

In October, 1865, Jos. W. Wiltberger sold to Caroline A. Cleaver, wife of Edward A. Cleaver, twenty acres of the said land, to-wit: the west half of the north half of the north half of the north-west. quarter of section 15, above, and executed to her a warranty deed for the same. This includes the land now in dispute. The deed was dated October 16, 1865, but was not delivered until afterwards, and was recorded June 9, 1866. After foreclosure under the power of sale, and at the time of the sale to Mrs. Cleaver, Jos. W. Wiltberger claimed the land as owner; but, owing to objections made at the time of this purchase by Mrs. Cleaver, the aforenamed proceeding was had to foreclose in the Superior Court. The Cleaver purchase was on the basis of a good title in fee to the twenty acres of land, and the price was $3500, or $175 per acre, which was then its full value. This twenty acres is the same land as that cov-

ered by block 1, in Yerby's subdivision.  Mrs. Cleaver and her husband made, and had recorded pursuant to the statute, a deed of vacation of said block 1, the deed being recorded April 25, 1867.

On June 20, 1867, Cleaver and wife, by warranty deed, recorded June 25, 1867, sold and conveyed her said twenty acres of land to Perkins Bass and Junius Mulvey.  The price was $8500, which was the fair value of the property at the time, and the purchase was made in the belief that the purchasers were getting a good title in fee simple to the property. The purchase money was all paid at or about the time of the delivery of the deed.

Junius Mulvey, by warranty deed dated September 17, 1867, and recorded September 23, 1867, conveyed his undivided one-half of this twenty-acre tract, for the expressed consideration of $5000, to Amarilla Bromley, now Mrs. Mulvey, the petitioner.  They were married September 25, 1867. The deed was executed in contemplation and consideration of marriage, which was its real consideration.

There were, subsequently, down to June 17, 1868, five several sales and conveyances, by warranty deeds, duly recorded, made of undivided portions of the Bass interest in this twenty acres, the sales and purchases being made as of a good title in fee simple, and the purchase price, in every case, was paid in cash.

On June 17, 1868, the then three owners of the undivided half Bass interest in the twenty acres, and Mrs. Mulvey, effected a partition of the twenty acres, by deeds, between themselves, whereby the north half became vested in Mrs. Mulvey in severalty, and the south half in the three others. At the same time, all these parties united in a subdivision of the twenty acres, which was recorded June 20, 1868.

There was another suit, brought by Joseph W. Wiltberger and one Martin Andrews, in the Superior Court of Chicago, for a further foreclosure of the Embree mortgage, against James T. Daniels and others, and all such unknown persons

as might claim any interest in the premises through or under Jesse Embree or George W. Yerby. The bill was filed April 5, 1868, and a decree entered October 26, 1868, finding the amount due upon the mortgage to be $106,916, and by an order entered November 14, 1868, the mortgage was finally foreclosed against all of the defendants in that suit, for non-payment of the mortgage debt. In that suit, neither Embree, nor any grantees under him of the land now in dispute, were made parties defendant by name.

The title exhibited by the defendants, Gibbons and his grantees, and the South Park commissioners, is as follows: A deed from Jesse Embree and wife to Amos F. Tompkins, dated August 19, 1859, recorded March 8, 1861, for lots 6 to 21, inclusive, in block 1, and sundry lots in block 2, in Yerby's subdivision, above referred to, with warranty, "except as to a mortgage on said property, executed by Jesse Embree to Jos. W. Wiltberger, to secure the purchase money on said premises, which said Tompkins hereby agrees to assume and pay; also, subject to certain specified contracts of sale which said Tompkins agrees to carry out."

The premises in question in this suit are the same as lots 6 to 13, in block 1, in Yerby's subdivision.

A deed from Tompkins to Daniel H. Carpenter, dated May 25, 1869, quitclaiming all right, etc., in block 1, in said Yerby's subdivision; also, a warranty deed from Carpenter to Joseph G. Gibbons, dated September 20, 1870, for lots 6 to 13, inclusive, in said block 1, etc.; also, a warranty deed from Gibbons to James H. Rees, dated September 20, 1870, for lots 6 to 13, inclusive, in block 1, and lots 1 to 13, inclusive, in block 2, in said Yerby's subdivision; also, a deed from Rees to the South Park commissioners, dated September 23, 1870, consideration $31,500, for the north 134 feet of said last named lots, in blocks 1 and 2. A boulevard, belonging to the system of parks as established by the act of 1869, takes the north 134 feet referred to in the last named deed.

It appeared that Mrs. Mulvey had possession of the said

north 134 feet, in block 1, deeded by Rees to the park commissioners, Gibbons having possession of the residue of the property in dispute in this suit. Mulvey paid taxes, for his wife, on her property for three years—1866, 1867 and 1868. Wiltberger paid the taxes from 1857 to 1866, except some paid on a portion by sub-purchasers under Embree, in 1859. Gibbons paid sundry taxes on the lots in petitioner's tract, beginning with the year 1869. The streets laid out according to the Mulvey subdivision are improved and traveled highways.

It was shown, by the proof, that the property advanced in price from $175 per acre in October, 1865, the date of the Cleaver purchase, to $20 per foot in January, 1869, about which time the Park act was passed.

Mr. John Borden, for the appellant.

Messrs. Bonney, Fay & Griggs, and Messrs. Ayer & Kales, for the appellees.

Mr. Justice Sheldon delivered the opinion of the Court:

The records of Cook county having been destroyed by the great fire in Chicago in October, 1871, and the title papers, to a more or less extent, of the petitioner, she filed her petition in this case, under what is called the "Burnt Record" act, praying for a decree establishing and confirming the title she claimed to the land in question. The act provides that, in case of such destruction of records, any court in the county having chancery jurisdiction shall have power to inquire into the condition of any title to, or interest in, any land in the county, and to make all such orders, judgments and decrees as may be necessary to determine and establish such title or interest, legal or equitable, against all persons, known or unknown; and that it shall be competent to determine and decree in whom the title is vested, whether in the petitioner or in any other of the parties before the court. Various persons were made defendants, but the

contest in the case is only between the petitioner, on the one side, and the defendants, Gibbons and the South Park commissioners, on the other, and the case will be considered only as regards them.

The whole question arises under the Embree mortgage, the defendants claiming under conveyance by the mortgagor, made subsequent to the giving of the mortgage, and the petitioner under conveyance from the mortgagee after the mortgage was made.

Petitioner insists the equity of redemption has been barred by foreclosure, or, that if not so barred, it was not enforceable against her as a purchaser, and claiming under purchasers for value, and *bona fide,* by reason of *laches,* neglect and abandonment on the part of the grantees and assigns of Embree, the mortgagor; and that the true question in the case is, whether the equity of redemption could be enforced against the petitioner at the time the petition was filed. Defendants insist there has been no valid foreclosure, and, in that event, deny that the question is as petitioner claims, but that, whether the equity of redemption can be enforced against the petitioner, is a question only to be determined upon a bill for foreclosure subsequently to be filed; that, under the statute, the question of *title* only is to be determined in this proceeding; that the mortgagor holds the title until the equity of redemption is regularly foreclosed, and hence that the court rightly decreed that the title was vested in the lawful grantees and assigns of Jesse Embree, and not in the petitioner, leaving the question, whether the equity of redemption was enforceable, open, to be determined upon bill to be filed to foreclose the mortgage—the decree expressly saving that right.

We concur in the view of the petitioner, that the proper question is, whether the equity of redemption was enforceable against the petitioner at the time the petition was filed; for if not, then the title was in the petitioner.

Defendants' position, as also the decree, would treat the case as one only to establish a lien by mortgage, and not as one

to establish title.  The statute, in terms, provides for two sorts of petition — one to establish title, the other to establish any lien by mortgage, etc.  The petition, here, is to establish title; the respective parties claim title under conveyances purporting to convey title.  The power of the court, under such petition, is, to inquire into the condition of any title to, or interest in, the land, and to make such decree as may be necessary to determine such title or interest, legal or equitable, against all persons, known or unknown.  We think the court, here, might properly determine in which party was the title or interest in the land, whether legal or equitable.

Petitioner claims there have been, here, three valid foreclosures.  One, by decree in the second foreclosure suit against Daniel and others, on bill for foreclosure filed April 25, 1868.  But that decree does not affect the defendants, because Tompkins, who then owned the equity of redemption—if it had not been previously foreclosed—was not made a party to the suit.  It is claimed that he was a party under the designation of "unknown persons," as the complainant in that suit did not know that he had right in the land.  This claim is entirely inadmissible.  Tompkins was a party to the first foreclosure suit, a well known resident of the county, and, because the party bringing the second foreclosure suit did not know that Tompkins' rights were not cut off by the decree of foreclosure in that former case, the latter can not be treated as an unknown person in the second foreclosure suit.  He does not fill the description of such person within the contemplation of the statute for making unknown persons parties.

Another foreclosure claimed, is under the power of sale in the mortgage.  The objections taken to this foreclosure are, that the property was bid in at the sale indirectly for the mortgagee; and that the deed executed pursuant to the sale, was made in the name of the mortgagee, and not in the name of Embree, the mortgagor; the mortgage providing that upon the sale, the mortgagee might, as the attorney of the mortgagor, for that purpose by the mortgage duly authorized and ap-

pointed, execute and deliver to the purchaser a good and sufficient deed, etc. The first objection would render the sale voidable only at the option of the mortgagor, to be determined in apt time. But neither he nor his grantees have ever taken any steps to set aside the sale. It is claimed that Wiltberger, himself, sufficiently impeached the sale by his first bill of foreclosure, wherein he set forth these two matters as affecting the validity of the foreclosure under the power of sale. Such averment in that bill was but the statement of a legal conclusion, as supposed to result from the facts, and made for the purpose of that suit as an excuse and reason for applying for a chancery foreclosure. The subsequent voluntary dismissal of the suit, it is contended, amounted to a withdrawal of this allegation in the bill, and that it should be counted for naught. We do not regard this statement in the bill, of itself, exclusive of influence it might have on subsequent conduct, as having any greater effect than the admission of the fact that the property was bid in for the mortgagee. It is said, the same statement is repeated in the present petition. We do not so understand. The petition makes reference to that bill to foreclose, stating that therein, among other things, the complainant averred the invalidity, in the respects named, of the foreclosure under the power of sale; the petition only stating, by way of recital, the allegations of the bill to foreclose.

The mortgage gives the power, in default of payment, to sell the land and all right of redemption at public auction, and declares that the sale shall be a perpetual bar to the right and equity of redemption. The sale itself, duly made, would seem to be the principal thing, and the substantial foreclosure of the right to redeem; and however, in case of such a form of mortgage, the deed made in the name of the mortgagee, and not in the name and as the attorney of the mortgagor, may be regarded as not conveying a good title in fee simple to the purchaser, as seems to have been held in *Speer* v. *Hadduck*, 31 Ill. 439, in an action of ejectment, we must regard such a pro-

ceeding for foreclosure as not to be disregarded in its bearing upon the equities in this case.

The decree of strict foreclosure in the case of *Wiltberger* v. *Embree et al.*, the first foreclosure suit, is mainly relied upon, as protecting the petitioner. Up to, and at the time of the institution of that suit, Wiltberger seems to have claimed and relied upon the foreclosure under the power of sale as a valid one. Mrs. Cleaver seems to have bought and paid for the land upon such reliance, though, at the time, it was thought advisable that a decree of strict foreclosure should be obtained, and probably the money was paid for the land under the expectation that such a decree would be procured.

Although Mrs. Cleaver, with reference to that foreclosure suit, bought *pendente lite*, and is, therefore, affected by the reversal of that decree, and she, herself, enjoys no protection from the decree, it is otherwise with her grantees, Mulvey and Bass. The decree of strict foreclosure was entered June 18, 1866.

The deed from Mrs. Cleaver and her husband was made to Mulvey and Bass, June 20, 1867. No step was taken toward reversing the decree until August 23, 1869, when the writ of *scire facias* to Wiltberger, defendant in error, was issued.

Although then the decree of foreclosure was reversed by judgment of this court on May 22, 1871, such reversal would in nowise affect the rights of Mulvey and Bass, as decided by this court in the cases of *Wadhams* v. *Gay*, 73 Ill. 415, and *Eldridge* v. *Walker*, 80 Ill. 270. They, having purchased while the decree of strict foreclosure was in full force, before any steps had been taken to reverse it, were entitled to put faith in and rely upon the decree as determining and binding the rights of the parties to the suit in the land. The case of the petitioner then claiming under Mulvey and Bass, or Mulvey alone, is to be considered as unaffected by the reversal, and as if the decree were now in full force.

Errors, if there be any in the decree, can not affect it collaterally, if there was jurisdiction.

There was full jurisdiction over Tompkins, under whom defendants claim, and even as to his co-defendant Ashton— upon whom service was held bad and made a ground of reversal—the decree would be good collaterally, as the writ on which the service was held bad was returnable to the December term, 1865. His default was not entered until June 11, 1866, before which time several terms of court had elapsed, there being a new term of the Superior Court begun on the first Monday of each month. By order of court of June 11, 1866, it was found that due personal service of process of summons had been had on Ashton. There having been, then, time for another summons and for a valid service of the same, they will be presumed, in the case of such a finding. *Miller* v. *Handy*, 40 Ill. 449; *Turner et al.* v. *Jenkins*, 79 id. 228.

The objection to the decree for uncertainty as to the amount found due and to be paid, we would regard as no more than error in the decree were the objection founded in fact; but we consider the decree as reasonably certain in this respect— that the sum was $45,000. The decree in this regard being: "And it also appearing to the court that the said Embree has only paid a part of one of the notes due January 1, A. D. 1859, to-wit: the sum of $1103.40 thereon, and that said complainant has received no other money on account of said notes, and that there is now due and owing on the said notes, over and above the sum of $45,000 beside, the sum of $52,800, yet to mature, but which, as provided by said mortgage, has also to become due and payable, making a total of some $97,800." —Then, afterward, follows the order to pay the amount then due and owing on the notes and mortgage.

The more serious objection taken to the decree is, that it was but a decree *nisi*, and that, in order to complete the decree as one of foreclosure, a further order of court was necessary, finding that the money had not been paid and making the foreclosure absolute.

The concluding portion of the decree was as follows:

"And it is also ordered, adjudged and decreed, that upon

the defendants, or either of them, paying to complainant the amount now due and owing on said notes and mortgage, together with the costs of this suit, within thirty days from the entry of this decree, that then the complainant cancel and satisfy of record said mortgage, if thereto required by said defendants, or either of them; but in default of such payment by defendants, or either of them, within the time aforesaid, then it is ordered, adjudged and decreed that the defendants, and each of them, do stand absolutely debarred and foreclosed of and from all equity of redemption of, in and to the said premises included in said mortgage, and set forth and described in said bill of complaint,"—particularly describing them.

No further order or decree appears.

The rule in English practice, in this regard, is thus laid down in Daniell's Chancery Practice, vol. 2, (4th Am. ed.) p. 996, *et seq.:* "There are some cases of decrees which, although they are final in their nature, require the confirmation of a further order of the court before they can be acted upon. * * * The most ordinary case, in which a further order is necessary to complete the decree, is that of a decree for a foreclosure. * * * If, upon that occasion (the time appointed for payment) the defendant does not attend to pay the money, the plaintiff's right to the estate will become absolute. He must, however, in order to complete his title, procure a final order for confirming it, otherwise the decree of foreclosure will not be pleadable."

It is contended by petitioner's counsel, that this rule of practice does not prevail in this State, and in the absence of any express decision of this court upon the point, he cites the case of *Chickering* v. *Failes*, 26 Ill. 507, as being in support of such view. The decree, there, was one of strict foreclosure. The form of the decree does not appear in the report of the case, but counsel set it forth at length as shown by the transcript of the record in that case, and it is a decree *nisi*, in form as in this case, with no subsequent order of confirmation appearing. This is not contradicted.

The decree of strict foreclosure, there, was held void for want of jurisdiction in the court to render it. It was there set up as color of title in bar of the right to redeem, the statute upon the question involved being, that on proof of the statutory requirements, the party claiming thereby "shall be held and adjudged to be the legal owner of the lands and tenements to the extent and according to the purport of his or her paper title." The decree was held to be good color of title, and, accompanied with the other statutory requisites, to be sufficient to bar the equity of redemption, because it purported to be a foreclosure of the mortgage. The answer made to this is, that the point now in question was not, in any way, raised or considered in that case. Without pronouncing as to the rule of practice in this State in the regard named, and for the present purpose admitting it to be as claimed by appellants, we deem the decree, as it is, in its bearing upon the equities in this case, as of sufficient avail to the petitioner.

At the date of the decree, and for a considerable time afterward, the property was worth very much less than the amount due of the mortgage debt. The decree determined the rights of the parties, and decreed, that unless the amount due was paid within thirty days, the defendants should be debarred from all equity of redemption of the premises. There is no pretense of the payment of any part of the money, or of excuse for non-payment, or of any readiness or disposition to pay anything. Why, in reason and justice, should not the right of redemption be barred as the decree declared?

The absence of a further order of confirmation was here a lack of but the merest technical form. According to the rule as laid down by Daniell, if the defendants did not pay the money the plaintiff's *right* to the property became absolute, though in order to complete his *title* there must have been a final order confirming it.

If the plaintiff's right to the property had become absolute, how, before a court of equity, could that consist with any remaining right of redemption in the defendants? Why, in

that court, where the real right, regardless of form, is regarded and given effect to, should not such an absolute right, as thus declared, be recognized and asserted ?

In *Kenyon* v. *Shreck,* 52 Ill. 383, this court recognize and declare the principle that the right of a mortgagor or his grantees to redeem after condition broken is a purely equitable right, which can be asserted only in a court of equity, and when its assertion would be plainly inequitable, that court will withhold its aid; and that where a defective foreclosure has been had, such equity of redemption will not be permitted to be asserted against an equity still stronger. And see *Hamilton* v. *Lubukee,* 51 Ill. 420; *Munn* v. *Burges,* 70 id. 604; *Bush* v. *Sherman,* 80 id. 160.

The application of that doctrine to the facts of the present case, must determine it in favor of the petitioner. There were here repeated attempted, and, as was supposed, sufficient, foreclosures of the equity of redemption. The moneys secured by the mortgage were largely in default in payment, the property worth but a small part of the mortgage debt. For a long time before such attempted foreclosure, as well as thereafter, neither Embree, the mortgagor, nor any of the parties claiming under him, offered to make any payments on the mortgage, or paid any taxes, or gave the property any attention, and apparently abandoned the same, as Egbert Wiltberger testifies they did abandon it.

It appears that Embree had made contracts of sale with several different persons for small portions of the premises, and Wiltberger had arranged to release their parts from the mortgage, on making their payments; that in, or before, 1859, some small payments were made by these under-purchasers, which were applied on the mortgage, and some taxes on their portions were paid in that year, but that, subsequent to that year, they never paid anything or any taxes, although applied to and urged to do so by Wiltberger, he offering to release from the mortgage, on payment of a very much less amount than a proportionate part of the mortgage debt,—in one in-

stance, on paying at the rate of $100 per acre. The abandonment was apparently entire, on the part of them all. Wiltberger and his grantees were allowed to deal with the property as their own, without objection. They paid the taxes, made a vacation of Yerber's previous subdivision, made a new and differing subdivision themselves, with streets which were improved and traveled as highways.

The condition of the title was such, that repeated and numerous sales and conveyances were all the while being made for the full value of the land on the basis of a good title, it being believed to be such, and so pronounced, upon legal advice taken in some cases. All this occurred before the eyes of Tompkins, who resided in Chicago, under whom defendants claim, and to whom Embree conveyed the equity of redemption in 1859.

This neglect, inaction and omission to intimate any adverse claim, and apparent content with and acquiescence in the several foreclosures, encouraged purchasers to deal with and buy the land as they did.

This silence continued, and there was no stir of this asserted equity of redemption until after an extraordinary increase in the value of the property had occurred from the passage of the Park act, when, in May, 1869, Tompkins quitclaimed his interest in the premises in question to one Daniel H. Carpenter, for no consideration, so far as the proof shows; after which, the decree of foreclosure was taken to this court, on error, and reversed. Gibbons, to whom Carpenter subsequently conveyed, does not appear to have paid any consideration. The South Park commissioners, who purchased from Gibbons, appear to have paid a valuable consideration, but they must be held to have had notice of the prior equity of the petitioner.

Viewing the equities between the parties, the petitioner appears to have the better right. The equity of redemption set up by the defendants should be regarded, we think, as not enforceable against the petitioner at the time the petition was filed, and, consequently, as barred; and if so, it confirms the

title in the mortgagee, and those claiming under him, making the title conveyed by the mortgage deed—which was conditional so long as the equity of redemption might be asserted—now absolute.

We are of opinion that, under the proceeding here adopted, the court below should have determined and decreed that the title in the land in question was vested in the petitioner.

The decree will be reversed, and the cause remanded for further proceedings.

*Decree reversed.*