IN THE MATTER OF THE ESTATE OF OSCAR A.
   AMY, DECEASED.   JENNIE AMY, APPELLANT, v.
   ROYAL D. AMY AND OTHERS, APPELLANTS, v.
   ADELIA YOUNG AND OTHERS, RESPONDENTS.[1]

1. COURTS OF GENERAL JURISDICTION.—A court which is compe-
     tent by its Constitution to decide on its own jurisdiction, and to
     exercise it to a final judgment, without setting forth in its pro-
     ceedings the facts and evidence on which its judgment or de-
     cree is rendered, whose record imports absolute verity not to

---

[1] Petition of Royal D. Amy et al. for a rehearing denied Jan.
20, 1896.

be impugned by affirmation or proof to the contrary, and whose judgments and decrees are conclusive and binding until reversed or modified by writ of error or appeal, is a court of general jurisdiction.

2. PROBATE COURTS.—COURTS OF GENERAL JURISDICTION AND OF RECORD.—The Probate Courts of Utah Territory prior to 1874, under various acts of the Legislature were exercising common law and chancery jurisdiction, and jurisdiction in criminal causes, but by an act of Congress, approved June 23, 1874, known as the "Poland Bill" they were shorn of their civil, chancery and criminal jurisdiction, except in divorce cases, in which they had concurrent jurisdiction with the district courts until 1887, when jurisdiction in this class of cases was taken from them by an act of Congress known as the "Edmunds-Tucker Act." They were courts having a seal, clerk, and kept records of their proceedings, which constituted them courts of record. Their judgments were reviewed by appeal and imported absolute verity until reversed or modified, and as to all matters within their cognizance, they are courts of general jurisdiction.

3. ID.—ID.—DECREE OF DIVORCE ENTERED BY PROBATE COURT MAY NOT BE ATTACKED COLLATERALLY.—A decree in a divorce proceeding, entered by a probate court, while such courts were lawfully exercising jurisdiction in that class of cases, is a decree of a court of general jurisdiction, which imports absolute verity, and may not be attacked in a collateral proceeding.

4. ID.—ID.—JUDGMENT ROLL.—SERVICE OF PROCESS BY PUBLICATION.—Under Comp. Laws 1876, § 1428, providing that the judgment roll should consist of the complaint, summons, affidavit of proof of service and a copy of the judgment, neither the affidavit, nor order for publication of summons is a part of the judgment roll, and their absence from the record may not be appealed to in a collateral attack to impeach the judgment reciting service of process by publication.

5. ID.—ID.—ID.—RECITALS IN DECREE.—CONCLUSIVE JURISDICTION OF DEFENDANT'S PERSON BY PUBLICATION IN A DIVORCE PROCEEDING.—AFFIDAVIT OF PUBLICATION.—The recital in a decree of divorce that "defendant was duly served with process by publication," not being contradicted by anything appearing in the judgment roll, is conclusive upon the court's jurisdiction

of the defendant's person when such decree is assailed in a
collateral proceeding, even though the affidavit of publication
failed to allege that the summons was published as provided
by statute.

6. ID.—ID.—ID.—ID.—CERTIFICATE OF CLERK.—A certificate by the
clerk in the minutes that certain papers were all the papers
filed in the cause, is not incompatible with the existence of an
·order for publication which was not in the files, since such
order was not required by statute to be made a part of the
judgment roll.

7. ID.—ID.—ID.—SERVICE BY PUBLICATION. — PRESUMPTION OF
COURT'S JURISDICTION.—ESTOPPEL BY CONDUCT.—Where a
judgment of divorce recited that defendant was duly served
with process by publication, the presumption of the court's
jurisdiction and of defendant's person is not overcome by the
fact of defendant's non-residence , since neither the property
rights of the parties nor the rights of their chil-
dren are determined thereby, and particularly as de·
fendant received notice of the proceedings, and both
plaintiff and defendant regarded the divorce as valid,
and each again married, and where both plaintiff
and defendant in a divorce proceeding are estopped by their
conduct to deny the validity of the decree therein rendered,
third persons will not be permitted to do so, where it would
bastardize many children, disrupt families, unsettle titles and
bring litigation and trouble to many homes.

8. PUBLIC LANDS.—POSSESSORY RIGHTS.—TOWNSITE ACT.—ADJU-
DICATION IN PROBATE COURT FINAL.—RIGHTS OF PERSONS UN-
DER DISABILITY.—Where husband in 1863 deeded certain land
in Salt Lake City, which was subject to the land laws of United
States to his wife for her life and after her death to become
the property of her son, but the wife in 1873 being in posses-
sion of the land, filed her declaratory statement in the Probate
Court under the townsite act of Feb. 17, 1869, § 3, which
provides that every person claiming to be the original owner of
possession, occupant or occupants, or to be entitled to such
occupancy or possession, shall file such statement or be for-
ever barred from any interest therein. Upon adjudication in
the Probate Court she was adjudged to be the original owner
thereof, and the mayor of Salt Lake City duly executed to her

a deed for the same in fee simple. The contention that the wife held the property in trust for her son is untenable, in that the statute contains no provision saving the rights of person under disability.

9. STATUTE OF DESCENT OR SUCCESSION.—WHEN KINDRED OF THE HALF BLOOD MAY INHERIT.—Under 2 Comp. Laws 1888, § 2749, providing that kindred of the half blood inherit equally with those of the whole blood, unless the inheritance came to the intestate by descent from some of his ancestors, in which case all those who are not of the blood of such ancestors must be excluded. Children of decedent's father by a former wife being half brothers and sisters of decedent, cannot inherit from him where the estate descended to him from his mother and from his half sister on his mother's side.

(No. 602./ Decided Dec. 21, 1895. 42 P. R. 1121.)

APPEAL from the District Court of the Third Judicial District. · Hon. S. A. Merritt, *Judge.*

In the matter of the estate of Oscar· A. Amy, deceased. Petition of Jennie Amy, wife of the deceased, for the distribution of the entire estate to her. Royal D. Amy and others, half brothers and sisters of deceased, pray for distribution of the estate to them. Adelia Young and others, maternal aunts of decendent pray for the distribution of the estate to them, representing that they were the sole heirs of deceased. From a judgment entered in favor of Adelia· Young and others, Jennie Amy and Royal D. Amy and others, prosecute separate appeals. *Reversed.*

*Mr. S. P. Armstrong (Mr. W. H. Dickson* of counsel), for Jennie Amy, appellant.

This case presents the following questions:
*First*—Is the Butterworth divorce valid?
If the divorce is held to be valid, then the further question arises as to whether one-half of the estate will

go to Royal D. Amy *et al.,* the half-brother and half-sisters of the decendent. Com. Laws, 1888, p. 123, §§ 2, 4.

If the divorce is held to be void then the further question arises as to whether the half-brother and half-sisters will inherit the whole estate or whether it will go to his maternal aunts, being next of kin in a more remote degree. Id. p. 123, §§ 3, 5.

*Second*—Is the mayor's deed conclusive as to the estate which Levira C. S. Amy held in said land?

If not, was the title derived from Dustin Amy of such nature as to bring it within the rule of ancestral estates, and thus allow the half-blood to inherit?

Our contention is:

*First*—That the decree of divorce is valid; and therefore Jennie Amy was lawfully married to decedent in 1886, and is now his legal widow.

*Second*—That the land was inherited by decedent from his mother and sister; and therefore the half-brother and half-sisters who are not of the blood of such ancestors will take no part of his estate.

*Third*—That he died without brother or sister of the full blood, and therefore capable of inheriting, and without issue, father or mother; and therefore that his whole estate goes to his widow, Jennie Amy. Com. Laws, p. 123, par. 4.

Presumptions are always in favor of a court of record, and jurisdiction will not be questioned collaterally unless there is some part of the record which contradicts the presumption. *Applegate* v. *Lexington Mining Co.,* 117 U. S. 269; Van Fleet on Col. Attack, §§ 830–1; *Harris* v. *Chipman,* 9 Utah, 104; *Roach* v. *Martin's Lessee,* 27 Am. Dec. 756; *Hahn* v. *Kelley,* 34 Cal. 391; *Skinner* v. *Moore,* 30 Am. Dec. 158; *Voorhees* v. *Bank,* 10 Pet. 471–2.

Jurisdiction by constructive service is entitled to same presumptions as in the case of personal service. 1 Free-

man on Judg. § 127; Van Fleet on Col. Attack, § 834; *Essig* v. *Lower*, 21 N. E. Rep. 1090–2; *Stewart* v. *Anderson*, 70 Tex. 592; *Hahn* v. *Kelley*, 34 Cal. 391–417; *Applegate* v. *Lexington Mining Co.*, *supra*.

### WHAT CONSTITUTES THE JUDGMENT ROLL?

Section 1428 (p. 457, Laws 1876), provides:

"Immediately after entering the judgment the clerk shall attach together and file the following papers, which shall constitute the judgment roll." The complaint, the summons, with the affidavit or proof of service, and a copy of the judgment.

It becomes important then to know what is meant by "affidavit or proof of service."

This provision was copied from California after the supreme court of that state had repeatedly held that "proof of service" does not include the affidavit or order. *Sharp* v. *Dangney*, 33 Cal. 512 (decided October, 1867); *Hahn* v. *Kelley*, 34 Cal. 404 (decided January, 1868); *Quivey* v. *Porter*, 37 Cal. 464 (decided April, 1869).

Hence the statute of Utah came to us pregnant of this construction, which construction is binding on the courts of Utah. Suth. Stat. Con. § 256.

By amendment, the affidavit and order of publication are now required to be made a part of the judgment roll in addition to the proof of service. Laws 1882, p. 78, § 25.

Later legislation is important as showing the legislative interpretation of earlier laws. *Cope* v. *Cope*, 137 U. S. 688.

Being no part of the record, the court will not look into the record to see whether the affidavit and order of publication were filed or not. They will not be considered when the judgment is attacked collaterally; and cannot be used for the purpose of overcoming the presumption of

regularity. *Harvey* v. *Tyler*, 2 Wall, 344; *Hall* v. *Law*, 102 U. S. 463; *Applegate* v. *Lexington Mining Co.*, 117 U. S. 269; *Galpin* v. *Page*, 1 Saw. 321; *In re Newman*, 75 Cal. 220. Also the California cases last above cited.

The rule that recitals in the decree are conclusive on collateral attack is further shown by the following authorities: 1. Black on Judg. §§ 273-4-287; 1. Freeman on Judg. §§ 126-130-2, 4 ed; *Hall* v. *Law*, 102 U. S. 464; *Adams* v. *Cowls*, 6 Am. St. Rep. 76 (Mo.); *Kinney* v. *Lewis*, 2 Utah, 517; *Callen* v. *Ellison*, 13 Ohio St. 454; *Shawhan* v. *Loffer*, 24 Iowa, 226; *Hahn* v. *Kelley*, 34 Cal. 407.

Jennie Amy offered the complaint and the decree which contained the recital as to service. These in themselves were sufficient to establish the divorce; and they should have been admitted. In addition to this she offered a copy of the summons as published in the newspaper, the original not having been found among the files in said case. She also showed by testimony that a summons was issued, and that the defendant received the summons through the mails as well as six copies of said newspaper containing publication of summons in said case.

This evidence was admissible as showing that the steps pointed out by the statute were followed. *Applegate* v. *Lexington Mining Co.*, *supra*, p. 268.

Even if the court in the case at bar could go outside of the judgment roll, and back of the finding of the probate court, "that said defendant was duly served with process by publication," for the purpose of considering the alleged irregularities in the service of summons, it would find that they are not such as to render the decree void. They are matters which can only, if at all, be attacked in a direct proceeding brought for that purpose.

The sufficiency of the affidavit for service of summons by publication was a matter to be determined by the court. Com. Laws 1876, p. 409, § 30.

And such determination is conclusive when attacked collaterally. *Pennoyer* v. *Neff*, 95 U. S. 721; *Pettiford* v. *Zoellner*, 45 Mich. 362.

The summons and order for publication which do not appear among the files are presumed to have been lost, and to have been regular in form. Freeman on Void Judgment Sales, § 8, p. 17; *Hurley* v. *Barnard*, 48 Tex. 83–87; *Wilson* v. *Holt*, 83 Ala. 540.

The sufficiency of the affidavit of the printer as to publication of summons cannot be questioned collaterally; for the statute of Utah provides that from the time service is had, the court acquires jurisdiction, and has control of all subsequent proceedings. Com. Laws 1876, p. 411, § 35.

It is the fact of service, not the proof which gives the court jurisdiction. *Kipp* v. *Fullerton*, 4 Minn. 480; *Pierce* v. *Butlers*, 21 Kans. 106; *In re Newman*, 75 Cal. 220; *Fanning* v. *Krapfl*, 68 Iowa, 248.

The court has power to order amendment of proof of service. Freeman on Judg. § 127 (last paragraph).

Therefore the court must have jurisdiction of the cause.

### COLLATERAL ATTACK IS NOT FAVORED.

Collateral attacks on judicial proceedings are never favored, and unless it is conclusively shown that the court had not jurisdiction, or that it transcended its jurisdiction, its judgment will be held to be valid. *Head* v. *Daniels*, 38 Kans. 12.

Particularly is this the rule where the equities of the case are all on the side of the party attempting to sustain the decree. When such is the case, a most liberal construction will be given in favor of the decree. *Ogden* v. *Walters*, 12 Kans. 235; *Gunnell* v. *Rice*, 13 Minn. 406.

### THE COURTS UPHOLD DECREES OF DIVORCE.

The subject-matter in suit for divorce is the status of

the party domiciled within the jurisdiction of the court. 11 Bish. Marriage, D. & S., chap. VI., with note to § 152; 11 Black on Judg. §§ 925–931–2. As domicile is what confers jurisdiction in divorce, it matters not, in adjudicating the status, whether the defendant has notice of the proceedings or not, unless a notice is prescribed by statute. 2 Bish. M. D. & S. §§ 76–138–157; *Maynard* v. *Hill*, 125 U. S. 209; *Pennoyer* v. *Neff*, 95 U. S. 734. Thus the law makes a distinction between jurisdiction of the status, and jurisdiction of the party defendant; and even in the case of foreign judgments, while a recital in the record as to domicile is not conclusive, yet a recital as to service of notice is conclusive. 2 Bish. M. D. & S. § 184; *Wallace* v. *Brown*, 76 Am. Dec. 425 (Ark.) See also *Borden* v. *State*, 54 Am. Dec. 242. Hence, we find the decisions almost uniform in upholding decrees of divorce when the court had jurisdiction of the subject-matter, even though the service of process was very irregular. *Pettiford* v. *Zoellner, supra.* Butterworth himself could not question the validity of the divorce at this late day. *Crosby* v. *Probate Court*, 3 Utah, 52; *Vorhees* v. *Bank*, 10 Pet. 472.

By his second marriage and long acquiescence he has affirmed and validated the decree even if it were invalid when rendered. Reno on Non-Residents, p. 317–8; *Loud* v. *Loud*, 129 Mass. 18; *Colton* v. *Rupert*, 60 Mich. 329; *Dunn* v. *Dunn*, 4 Paige, 430; *Singer* v. *Singer*, 41 Barb. 140; *Nichols* v. *Nichols*, 25 N. J. Eq. 65.

By action brought within reasonable time he might have attacked the decree, only by direct proceedings for that purpose. *Hendrick* v. *Whittemore*, 105 Mass. 26; *Henderson* v. *Stanford*, Id. 506.

And the plaintiff cannot impeach the judgment after obtaining the decree. *Hendrick* v. *Whittemore, supra; Henderson* v. *Stanford, supra; Lapham* v. *Briggs*, 27 Vt. 35; *Ellis* v. *White*, 61 Iowa, 646.

That is, Mrs. Amy could not now claim to be the wife of Butterworth, nor could' Butterworth claim to be her husband. A husband without a wife, or a wife without a husband does not exist in reason or law. 1 Bish. M. D. & S., § 698 *et seq.* 837; 2 Bish. Id. §§ 137-153-154; *Richardson* v. *Simons,* 47 Mo. 26; *Marriam* v. *Wolcott,* 61 How. Pr. 393.

Can a stranger to the record now be heard to say that Mrs. Amy and Elliot Butterworth are husband and wife? *Skinner* v. *Moore,* 30 Am. Dec. 157. After great lapse of time any reasonable presumption of fact will be conclusively indulged in order to sustain a decree of divorce. *Wilson* v. *Holt,* 83 Ala. 540; 1 Bish. M. D. & S. §§ 77, 956-8, 1148-9; *Carroll* v. *Carroll,* 20 Tex. 741. Reasons of public policy favor the upholding of the validity of divorce where there is subsequent marriage of the parties. 1 Bish. M. D. & S. § 1148; *Wilson* v. *Holt, supra; Maynard* v. *Hill,* 125 U. S. 204-8; *Blanchard* v. *Lambert,* 22 Am. Rep. 245.

### THE HALF BLOOD DO NOT INHERIT.

We now come to the consideration of the second branch of the case.

Do Royal D. Amy *et al.* inherit any part of this estate?

Under the Common Law half-blood did not inherit. 11 Black. Com. 227 (Cooley's ed., p. 226).

Unless the statute comes to their aid they will take no part of the estate. *Den* v. *Stretch,* 4 N. J. L. 214.

By statute the right of inheritance has been extended to the half-blood, except in the case of ancestral estates, in which case the half-blood is excluded, unless such half-blood is of the blood of the ancestor from whom the estate came to decedent. Com. Laws 1888, § 2749, p. 125.

This brings us to the consideration of who, in this case,

is the ancestor from whom the estate came to Oscar Amy, the decedent.

It is claimed by Royal D. Amy *et al.*, they being of the blood of Dustin Amy, that Dustin Amy, by virtue of his possessory claim, and deed to his wife and son, is to be counted the source of title to this land, and that, therefore, they can inherit through their half-brother, the decedent, Oscar A. Amy, whatever he inherited from his half-sister, Levira A. Smith, as well as the half interest which he inherited from his mother direct.

This position is not tenable for two reasons:

*First,* the adjudication in the probate court, that Levira C. S. Amy was the owner of this land is conclusive, and she must be regarded as the person who first brought the property into the family. *Drake* v. *Reggell,* 37 Pac. Rep. 584 (Utah); *Rodgers* v. *Thompson,* 9 Utah, 47; *Smelting Co.* v. *Kemp,* 104 U. S. 647; *Duffay* v. *Mix,* 24 Or. 268; *Ming* v. *Foote,* 23 Pac. Rep. 515–20; *Baker* v. *Bickerel,* 25 Pac. Rep. 492.

At the time this alleged deed is claimed to have been executed Dustin Amy had no estate in the land which he could charge with a future estate, that is, he could do nothing more than to transfer the possession by any instrument he might execute. *Buxton* v. *Traver,* 130 U. S. 235.

*Second*—The word ancestor is construed to mean the last possessor before the decedent; that is, the person from whom the land immediately descends to the decedent. Under these decisions the propositus, as to the undivided half which he inherited from his mother, is the said Levira C. S. Amy, and as to what he inherited from his half sister, is the said Levira A. Smith. *Gardner* v. *Collins,* 2 Pet. 89; *Cutler* v. *Woddington,* 22 Mo. 264; *Den* v. *Searing,* 8 N. J. L. 345; *Valentine* v. *Wetherill,*

31 Barb. 660; *West* v. *Williams,* 15 Ark. 693; *Wheeler* v. *Chutterbuck,* 52 N. Y. 70; *White* v. *White,* 19 Ohio St. 534; Note to *Prescott* v. *Car,* 61 Am. Dec. 660. On her death the legal estate descended to Oscar A. Amy as her heir, and it is well settled that where the legal and equitable estate in the same land become invested in the same person, the equitable will merge in the legal estate. *Whyte* v. *Arthur,* 17 N. J. Eq. 523; 1 Perry on Trusts, § 347.

Chancellor Kent, in a case very much in point, held that the equitable estate inherited from one ancestor merged in the legal estate inherited from the other ancestor, and did not open or separate at the death of the heir; and that the course of descent of property, which had been so inherited is to be determined by the legal title. *Nicholson* v. *Halseg,* 1 Johns. Ch. 420.

The same law is enunciated in the following cases: *Patterson* v. *Lamson,* 45 Ohio St. 90; *Shepard* v. *Taylor,* 3 Atl. Rep. 383 (R. I.); *Shelby* v. *Ashton,* 3 Ves. Jr. 339.

On the authority of the supreme court of Michigan, Royal D. Amy *et al.* claim that, there being no brother or sister of the whole blood, or of the half blood who is also of the blood of the propositus, they will inherit, although not of the blood of the propositus, in preference to relatives of a more remote degree. *Rowley* v. *Stray,* 32 Mich. 76; *Ryan* v. *Andrews,* 21 Mich. 233.

This position is also not tenable for two reasons: *First* —Because, under the Utah statute, the widow is placed in the same class with the brothers and sisters (where the father or mother is living she has a preference even over brothers and sisters); so that Jennie Amy as the widow of decedent, is preferred, even under the rule in Michigan, to brothers and sisters of the half-blood who are not of the

blood of the propositus. Com. Laws 1888, § 2741, p. 123, par. 2.

*Messrs. Pence & Allen,* for Royal D. Amy and others, appellants.

In this cause there are two propositions, upon either of which Royal D. Amy and his sisters are entitled to the premises in controversy. Dustin, the father of Oscar and these claimants, was the actual occupant and entitled to the possession of the premises in and prior to 1863. In that year he deeded the premises to his wife, Levira, the mother of Oscar, with remainder in fee to Oscar. She entered into possession with her son and with him continued in possession until her death. Levira C. in due time made application to the probate court, under the townsite law, and upon an adjudication the premises were awarded to her and a mayor's deed made and delivered. At this time Oscar was still an infant, and she was his natural guardian, and also a trustee under the Dustin Amy deed. She accepted the trust, and it was not within her power to repudiate it and claim the property as her own to the exclusion of her *cestui que trust.* In fact, the adjudication was made in her favor on her record title, the Dustin Amy deed. But apart from this circumstance the mere fact that she was the natural guardian of her infant son, and trustee under the Dustin Amy deed, brings into operation that rule of equity by which whatever title she may have acquired by virtue of the proceedings in the probate court under the townsite law, was for the benefit of her *cestui que trust.* And the failure of a minor claimant to adverse his trustee's application for patent does not affect his rights. The trustee takes the legal title in trust, and this trust may be declared after patent

issues. *Kimball* v. *McIntire,* 3 Utah, 77; *Marques* v. *Frisbie,* 101 U. S. 473; *Moore* v. *Robbins,* 96 U. S. 530; *Estrada* v. *Murphy,* 19 Cal. 249; *Wilson* v. *Castro,* 31 Cal. 439; *Bludworth* v. *Lake,* 33 Cal. 255; *Eversdon* v. *Mahew,* 65 Cal. 163; *Coy* v. *Coy,* 15 Minn. 119; *Treadway* v. *Wilder,* 8 Nev. 91; *Hardy* v. *'Harbin,* 4 Sawyer, 536; *Hunt* v. *Patchin,* 13 Sawyer, 304; *Susenbach* v. *Bank,* 41 N. W. Rep. 662.

Oscar Amy was therefore the owner of these premises, and by virtue, primarily, of the deed from his father who was the father of these claimants. Royal D. Amy and his sister are therefore entitled to these premises under whatever construction may be given to our statute of descents.

It was held by the court below that under the decision of this court in the case of *Drake* v. *Reggel,* 10 Utah, 376, this right arising from the Dustin Amy deed, cannot be brought forward. As against an innocent purchaser for value there might be some ground for this objection, but we would call the court's attention to the fact that in this case no such question arises. This case stands in the same position, and the rights of our claimants should be determined by the same rules as if Oscar Amy, the *cestui que trust* and remainder, were the plaintiff, and his mother, Levira C., the trustee and holder of the life estate, were the defendant. There are no third parties interested. No one who has parted with one dollar on the faith of the mayor's deed, or the adjudication of the probate court. Even were that the case, such purchase might be met with the record of the Dustin Amy deed, the Clive deed and the memoranda of the probate court, showing that Levira C's right was based on that deed. But no such question comes into this case as in the *Drake* v. *Reggel* case. It should also be borne in mind that in this case the trust created by the deed was of a definite character, as to its extent, the *cestui que trust* and his interest, while in the

*Drake* v. *Reggel* case the trust was indefinite. Another element in that case, not in this, is the fact that the deed was recorded in the proper book. In the absence of clear proof of a better title, that of Oscar, through the deed from his father, will certainly prevail for the purpose of the distribution of this estate, and the estate will be distributed on the basis of that title. That such an interest is one sufficient to pass by deed, mortgage and inheritance has been so well established by the history of Utah prior to the townsite law and by decision of our courts since that act, that citation is hardly necessary. *Hussey* v. *Smith,* 99 U. S. 20–25; *Ashby* v. *Hall,* 119 U. S. 526; *Lamb* v. *Davenport,* 18 Wall. 307; *Stark* v. *Starr,* 94 U. S. 477; *Grover* v. *Hawley,* 5 Cal. 486; *U. S.* v. *Tithing Yard,* 9 Utah, 272.

*First*—It was not signed by the probate judge.

*Second*—It does not appear ever to have been recorded in the records of the probate court, as required by law. 2 Comp. Laws, 2818.

*Third*—Neither by its terms nor by any other of the files or records of the probate court does it appear that full minutes of the testimony offered in support of the claim of Levira C. Smith were kept or entered upon the records of said court. 2 Comp. Laws, 2818.

Were it not for section 2749 of our statute it would be admitted by our opponents here that under the provisions of section 2741 Royal D. Amy *et al.* would inherit either as "brother and sisters" or as "next of kin" of deceased. It is then necessary to determine whether section 2749 applies to this case. It cannot be contended that it applies to all the provisions of section 2741 in cases of ancestral estates, for, if so, then the wife could never inherit from the husband any of his estate except that which was acquired by his own efforts, for she is not of the blood of those from whom the husband received the estate.

It will be noticed that the plan of the common law has been abandoned, and a better one has been adopted, viz: that of distributing the estate to those nearest of kin to the deceased, whether related by blood or not. By this arrangement the wife is placed in the first preferred class with the children. Next come the parents, then the brothers and sisters and their descendants. The estate thus descending by preferred classes which are clearly designated and defined. After these preferred classes, which are expressly named, are exhausted a new classification begins, viz: the next of kin. The statute then proceeds to define who are the next of kin, and prescribes that the rule of the civil law shall be followed in determining the *degree* of relationship, and the second series of preferred classes, (that is, the series which begins after exhausting the first series of preferred classes specially named), is governed by this rule of the civil law as to *degree* of relationship. Where there is a wife, child, parent, brother or sister, who constitute the preferred classes, the degree of relationship is not considered. Only when there is no wife, child, parent, brother or sister, this second series of classification begins, and in this second series the grand parents are the first class, the uncles and aunts the second class, etc. We have then two well defined classes of heirs. The first being the several classes defined by the first four subdivisions of section 2741, and the second, which begins after the first series is exhausted, being the several classes of next of kin according to the degree of kinship as fixed by the rule of the civil law.

Now to answer the question as to where section 2749 applies. We say by the strict rule of construction it applies only to a case where the following conditions exist, viz.:

*First*—Where there is an ancestral estate.

*Second*—Where the claimant comes within one of the

second series of classification, *i. e.*, where his right to inherit exists by reason of his being within a certain degree of relationship and not within one of the first series of preferred classes expressly named by the statute.

*Third*—Where in that same degree with the claimant there are claimants both of the whole and the half blood, some being of the blood of the ancestor and others not of such blood.

If either of these conditions be wanting it does not apply. To this effect is the decision of Chief Justice Ryan in the *Kirkendall Estate*, 43 Wis. 177. In construing a statute identical with ours, he says: "*It can have no application* except in cases of *next kin of the half blood and the whole blood in equal degree.*" And such is evidently the spirit and intent of our statute. That is to say, if the claimant be without any of the classes expressly preferred, viz., either wife, child, parent, brother or sister, this simple fact of near relationship to the deceased is by the statute made sufficient without inquiry as to blood, or where the estate came from, and section 2749 does not apply. It is only when we come to distant relations that the question of blood is made material. But it is contended that section 2749 applies to brother and sister, notwithstanding the fact that brothers and sisters are a preferred class by statute as much as is that of husband, wife, parent or child. We still think our proposition sound, that if section 2749 applies to one of these preferred classes it applies to all; and since it is admitted that it does not apply to the wife, it does not apply to the brother and sister, but only where the right to inherit depends upon the degree, and not the class, for that is the word used in the statute in question.

There being no issue, no father nor mother and no widow, the whole of the estate goes to the half brother and sisters, Royal D. Amy *et al.*, there being no brother

or sister of the whole blood, and no half brother or sister of the blood of the ancestors from whom Oscar inherited the property.

If the claim of the widow be established, then one-half goes to the widow and one-half to Royal D. Amy *et al.,* the half brother and sisters. Comp. L. of Utah, 1888, vol. 2, § 2741, subs. 2, 3.

That the word "brother" in the statute includes "half-brother," the authorities are agreed. 2 Jarman on Wills, (ed. of 1890), p. 700; 2 Redfield on Wills, 30; Williams on Executors, 1188; *Clark* v. *Sprague,* 5 Blackford, 412, and cases cited; *Rowley* v. *Stray,* 32 Mich. 70, and cases cited; *Gardner* v. *Collins,* 2 Peters, 28; *Sheffield* v. *Lovering,* 12 Mass. 490; *Clay* v. *Cousins,* 1 T. B. Monroe, 75, in which the court says that the half brother is "most emphatically a *brother.*"

At common law only those of the blood of the first purchaser could inherit. In most of the American states this basis of descents has been abandoned and a new basis, viz.: that of nearness of kin, has been adopted. Under this American plan the question of blood cuts little figure, the estate going to certain *preferred classes* in order of their respective relationship to the deceased. 4 Kent's Com. 412 and 406 and note; 24 American & Eng. Enc. of Law, 348.

A few of the states have preserved this feature of the common law and have framed their statutes of descent on the basis of the "blood" instead of on the nearness of kin to the deceased.

Most of the western states have adopted the plan or policy of favoring those nearest of kin to the deceased and disregarding the question of blood, placing the wife (who is not of the blood) in the *preferred class.* Such is the law in California, Nevada, Idaho, Montana, Colorado, Utah, Michigan, and many others. While many of these states

have exactly the statute that we have, including section 2749, unfortunately the question of construction of this particular section has not arisen in any except in Michigan and Wisconsin. In these two states the section in question is the same as ours, and the other sections of their statutes of descent are the same in effect as ours, that is, they disregard the question of blood and prefer those nearest of kin. For this reason the decisions of these two states are of special value in determining this question. In Michigan and Wisconsin a statute similar to ours in all respects, the supreme courts have said that the effect of their statutes of descent is to favor certain preferred classes, viz: those nearest of kin to the deceased, and not those of the blood of the ancestor from whom the estate came. *Kirkendall Estate*, 43 Wis. 167; *Ryan* v. *Andrews*, 21 Mich. 229.

*Rowley* v. *Stray*, 32 Mich. 70, which is squarely in point, the facts being the same as in the case at bar, viz: the half brother not of the blood of the ancestor took in preference to the uncles who were of the blood of such ancestor.

That the plan of the Michigan statute is the same as ours. See Howell's An. Stat of Mich., vol. 2, page 1503 and 1505 and note.

Statutes similar to ours in effect, though differing in language, have been construed in Indiana, North Carolina and Tennessee, and in each of these states it is held under such statutes that the *half brother not of the blood of the ancestor* takes in preference to a more distant relative though of such blood. *Pond* v. *Irwin*, 15 N. E. Rep. 272 (Ind.); *Ballard* v. *Murphy*, 3 Murphy (N. C.) 410; *Chaney* v. *Barker*, 59 Tenn. 424.

*Mr. Le Grand Young*, for Adelia Young and others, respondents.

In answer to the first part of appellant's brief, indeed

all that portion that attempts to establish that the probate court was a court of general jurisdiction, and had chancery and common law powers by the several acts of the legislature of the territory of Utah, I need only refer the court to *Ferris* v. *Higley*, 20 Wall. 375.

The court in announcing the law on this question, Justice Miller delivered the opinion of the court (see syllabus): " The act of the territorial legislature conferring on the probate courts a general jurisdiction in civil and criminal cases both in chancery and common law is inconsistent with the organic act and is therefore void." So it seems that all this reciting of statutes made by appellants to establish the general jurisdiction of the probate courts comes to naught, for the supreme court said all these acts were absolutely void.

The counsel attempted again to say that the act of Congress continued the jurisdiction of the probate court in divorce matters.

I ask the court to read the Poland law, found on page 101, vol. 1, Comp. Laws of Utah.

It will be seen by reference to that statute (see latter part section 3, page 103) that Congress does not recognize that the probate courts ever had such jurisdiction or had jurisdiction in divorce, but simply says the probate courts in their respective counties shall have jurisdiction of suits for divorce, etc.

Then afterwards, on page 104, to avoid any difficulty that might arise from the fact of the probate court not having any jurisdiction over matters theretofore pretended to have been given by the legislature of Utah, Congress says all judgments and decrees heretofore rendered by the probate courts which have been executed, etc., are hereby validated and confirmed.

Let me ask what would have been the necessity of validating and confirming these acts and decrees if they had

been valid? To ask the question is to answer it. So that part of the brief can be passed by without any further comment.

We will concede that, in all matters of letters testamentary and guardianship of minors, the probate court is a court of general jurisdiction, but beyond that the statement is utterly incorrect, and cannot be established by any respectable authority. It is not a court of common law or chancery jurisdiction. It had jurisdiction of divorce by special enactment of Congress.

By act of Congress probate courts were established just the same as chancery and common law courts were organized in Utah; and like courts of chancery and common law, probate court has jurisdiction of all matters and things that come within its cognizance, in harmony with the objects for which it was created. To illustrate, the district courts of Utah are courts of common law and chancery jurisdiction, and all presumptions are favorably construed in favor of the jurisdiction of such courts when acting on common law and chancery matters. The same may be said of the probate court when dealing with matters of a probate nature, such as the settlement of estates of deceased persons. But when any court either of limited or general jurisdiction is acting under some special statutory authority not in the course of common law, then this liberal presumption that every thing is done that should be done ceases to exist, and the judgment in such cases is open to collateral attack and inquiry. *Galpin* v. *Page,* 18 Wall. 350, 365. And particularly is this so when such judgment is introduced by the person who claims the benefit under it. *Hiskey's Lessee* v. *Stewart,* 3 How. 756–763. This is now the settled doctrine in the Supreme Court of the United States, and in the circuit and district courts of the United States, and by the weight of authority in all the states of the Union.

Nor could this defect be cured by a recital in the judgment if due service had been had even in courts of general jurisdiction.

In the case of *Galpin* v. *Page,* 18 Wal. 350, 365, now deemed the leading case on this subject, not only in the United States courts but in all the courts of this country, Mr. Justice Field delivering the unanimous opinion of the court, says, page 368:

"Whenever, therefore, it appears from the inspection of the court of general jurisdiction that the defendant, against whom a personal judgment or decree is rendered, was, at the time of the alleged service, without the territorial limits of the court, and thus beyond the reach of its process, and he never appeared in the action, the presumption of jurisdiction over his person ceases, and the burden of establishing the jurisdiction is cast upon the party who invokes the benefit or protection of the judgment or decree. This is so obvious a principle, and its observance so essential to the protection of parties without the territorial jurisdiction of the court, that we could not have felt disposed to dwell upon it at any length, had it not been impugned and denied by the circuit court." Referring to *Galpin* v. *Page,* 1 Saw. 309.

Further on in the same case, the court says:

"When, therefore, by legislation of a state constructive service or process by publication is substituted in place of personal citation, and the court upon such service is authorized to proceed against the person or absent party, not a citizen of the state nor within it, every principle of justice exacts a strict and literal compliance of the territorial provisions. And such has been the ruling, we believe, of the courts of every state in the Union." See, also: *Morse* v. *Presby,* 5 Foster, 392; *Thompson* v. *Whitman,* 18 Wall. 457; *Harris* v. *Hardman,* 14 How. 334; *Earle* v. *McVeigh,* 91 U. S. 508.

Again, in the case of *Applegate* v. *Lexington, etc., Mining Co.*, 117 U. S. 271, cited by appellant, the case of *Galpin* v. *Page* is again mentioned, and the doctrine therein announced in regard to constructive service is distinctly enunciated.      See, also: *Cuddy Petitioner*, 131 U. S. 285; *Novle* v. *Union River Logging Ry.*, 147 U. S. 173; *Pennoyer* v. *Neff*, 95 U. S. 714; 1 Peters, 340; 3 How. 762; 8 How. 681–2; 124 U. S. 220, and cases there cited; 1 Black on Judgments, 232; Freeman on Judgments, 127; *Hiskey's Lessee* v. *Stewart*, 3 How. 634; *Thompson* v. *Whitman, supra; Guaranty Trust Co.* v. *Greene*, 139 U. S. 147.

It is never competent for a court to receive parol testimony to supply the omission of the record.      *Gray* v. *Larimore*, 4 Sawyer, 638-46; *Paine* v. *Young*, 4 Seldon, 158.

There an attempt was made to supply the omission of the affidavit by evidence at the trial that the affiant was in fact the principal clerk of the printer, and such evidence was clearly inadmissible.      The statute prescribes the character of the evidence which shall be produced and by whom it shall be given.      Statutory proof will alone suffice.

The same doctrine is announced in *Noyes* v. *Butler*, 6 Barb. 617; *Lowery* v. *Cady*, 4 Vt. 506; and in the case of *Cissell* v. *Pulaski Co.*, 10 Fed. Rep's 893, the court says: "It is not competent for this court to receive parol testimony to supply the omission of the record."      Citing the cases I have above quoted and some others; *Martin* v. *Barber*, 44 Fed. Rep., announces the same doctrine.

It should not be forgotten that this doctrine established by *Hahn* v. *Kelly* in California was without precedent in and against the settled doctrine of its courts.      *Jordon* v. *Giblin*, 12 Cal. 100; *Ricketson* v. *Richardson*, 26 Cal. 149; *Forbs* v. *Hyde*, 31 Cal. 342.

In the cases of *Guaranty Trust Co.* v. *Greene et al.*, 139 U. S. 147, above cited, the court says:  "That it is a rule

well settled in the jurisprudence that the jurisdiction in any court exercising authority over the subject may be inquired into in every other court when the proceedings in the former are relied upon and brought before the latter by the party claiming the benefit of such proceeding. The rule prevails whether the decree or judgment has been given in a court of admiralty, chancery, ecclesiastical, or a court of common law. The decisions in these courts upon this subject, beginning with the year 1794, have been uniform and consistent."

The case of *Wells* v. *Brain*, 76 Am. Dec., and the case of *Borden* v. *State*, 54 Am. Dec., are not divorce proceedings, nor was the case of *Vorhees* v. *Bank*, 10 Peters. Nor do the cases of *Lund* v. *Lund*, 129 Mass., or *Dunn* v. *Dunn*, 4 Paige; nor *Singer* v. *Singer*, 44 Barb.; *Nicholas* v. *Nicholas*, 25 N. J. Equity, cited by appellant, sustain the position taken by her; that is, that courts do not uphold decrees in divorce any more than other cases, except when one of the parties to the divorce, after long years of acquiescence, seeks to disturb it. *Kelly's Heirs* v. *McGuire*, 15 Ark. 555; *Valentine* v. *Welherell*, 31 Barb. 665; *Conklin* v. *Brown*, 57 Id. 655; *Prescott* v. *Carr*, 61 Am. Dec. 661, and particularly a note pages 661-2-3.

KING, J.:

From the record before us it appears that Dustin Amy was married to Leonora Scott Amy, by whom he had several children, who are known herein as Royal D. Amy *et al.;* subsequently he married Lavira C. Smith, widow of Samuel Smith, who bore him one child, the decedent herein; that said Lavira C. Smith-Amy had one child, Lavira A. Smith, by her first marriage; that in 1883, said Lavira C. Smith-Amy died, leaving, surviving her, as her only heirs (her husband being dead), Oscar A. Amy and Lavira A. Smith, and by order of the probate court of

Salt Lake county, her estate was distributed in December, 1888, to her said heirs. Two days later, Lavira A. Smith died, intestate, leaving, surviving her, no children, nor father nor mother. In April, 1886, Oscar A. Amy married Jennie Amy; and in May, 1889, he died intestate, without issue, leaving, surviving him, the said Jennie Amy, who claims his estate as his widow, and his half brothers and sisters, named herein as Royal D. Amy *et al.*, and his aunts, Adelia Young *et al*, sisters of his deceased mother. The estate left by decedent consists of valuable property in Salt Lake City; and in the probate court Jennie Amy petitioned for the distribution of the entire estate to her; alleging that she was his wife and sole heir; that he died leaving no brothers or sisters of the whole blood, the blood of the mother of said decedent; that the property of which he died seised was inherited by him from his mother, and was originally acquired and owned by her. Adelia Young *et al.* also prayed for distribution of the estate, representing that they were the maternal aunts of the deceased, and his only heirs, and averring that Jennie Amy was not the widow of the deceased. Royal D. Amy *et al.* alleged in their petition for distribution that they were the sole heirs of deceased; that the estate was originally acquired and owned by Dustin Amy; and that it came by devise from him to said deceased. They also denied that Jennie Amy was decedent's widow. The probate court distributed all of the estate to Adelia Young *et al.*, and appeal was had therefrom to the district court, where the judgment of the probate court was affirmed.

The questions presented for our consideration are: (1) Was Jennie Amy lawfully divorced from her first husband, Elliott Butterworth? (2) Did the estate come from decedents father or mother? (3) If the divorce was valid, is Jennie Amy the sole heir of decedent. or do his half brothers and sisters share in the estate?

1. In support of her contention that she was the sole heir of deceased, and had been lawfully divorced from her former husband, Jennie Amy testifed that she was married to deceased in 1886, and lived with him as his wife until his death. During this period she bore him two children, both of whom died prior to his decease; that in 1876 she married one Elliott Butterworth, and thereafter was divorced from him. Elliott Butterworth testified that he was married to Jennie Amy, and that, when she instituted divorce proceedings, he was a resident of Franklin, Idaho; that he received a summons from the probate court, and also at least six copies, each of a different issue, of the Silver Reef Miner, a newspaper, containing a copy of the summons; and that he cut the notices out (five of which witness produced in court). He also stated that he believed the divorce to be valid, and the following year married again, and had lived with his wife continuously until the present; that she had borne him seven children. The original complaint, duly verified, and which charged desertion upon the part of the defendant in that action, together with a decree of the court rendered in the case, were offered, and also a copy of the Silver Reef Miner, of the issue of July 30, 1879, showing publication of service in due form. Counsel for Royal D. Amy *et al.* and Adelia Young *et al.* objected, claiming, among other things, that they were incompetent, because the record showed no affidavit or order of publication, and no proof of service of summons. The proceedings of the probate court showed that the attorney for plaintiff filed an affidavit, averring that defendant Elliott Butterworth was a nonresident of Utah; that his last known place of residence was Franklin, Idaho; and prayed for service by publication. The affidavit of publication was made by the publisher of the Silver Reef Miner, and stated that "he has within the last forty days forwarded to the defendant four different

copies of the above-named paper, at four several times,
containing summons in the above-entitled action, and that
said summons was a copy of the same issued by the clerk
of the probate court of Washington county, territory of
Utah, and that the same was addressed to the defendant
in the above-entitled action at Franklin, Idaho territory."
A certified copy of the minutes of the probate court
showed that the case was heard September 3, 1879, and
that the affidavit of the publisher was presented as "proof
of publication of summons;" that plaintiff appeared in
person, and by her attorney, and offered testimony; and
that the court ordered decree to be entered for plaintiff.
Attached to a certified copy of the minutes was the cer-
tificate of the clerk "that the foregoing are all the papers
which are filed in said cause." Counsel for Jennie Amy
objected to the introduction of any of the papers in said
cause, excepting the complaint and decree of divorce, and
counsel for the other parties objected to any of the papers
being received. The court finally sustained the latter's
objection, holding that the statute relating to publication
of summons had not been followed, and that the divorce
was invalid.

Did the court have jurisdiction to render the decree in
the case? This involves the question of what is sufficient
to constitute substituted service. The statute of Utah in
force at that time provided that "when the fact of non-
residence shall appear by affidavit to the satisfaction of
the court, and it shall in like manner appear that a cause
of action exists against defendant, or that he is a neces-
sary party to the action, the court may grant an order
that the service be made by publication of summons, and
the order shall direct the publication to be made in some
newspaper to be designated, as most likely to give notice
to the person to be served. Proof of service shall be the
affidavit of the publisher showing the same, and an affi-

davit showing deposit of a copy of the summons in the post office, if the same shall have been deposited. The publication shall be inserted four times consecutively, the first insertion being at least forty days before the time for answer, and a copy of which shall be immediately deposited, postage prepaid, in the post office, directed to defendant at his last known place of residence or business." The decree rendered in the cause contains a recital of due service of process by publication upon the defendant; and the appellant Jennie Amy contends that the probate court is a court of record, and in this collateral proceeding the judgment therein rendered cannot be impeached; that the record imports verity; and that any of the papers which may be found in the files cannot be received to contradict the recital of due service.

Respondents claim that, when jurisdiction is to be obtained by publication against a nonresident, there is no presumption in favor of the record, and jurisdiction does not attach unless the statute is strictly followed. It becomes necessary to determine whether the probate court was a court of superior or general jurisdiction. Prior to 1874, under various acts of the legislature, the probate courts possessed common-law and chancery jurisdiction, and authority to try and determine criminal cases. While many of these enactments conferring this jurisdiction upon such courts, were unconstitutional, they indicate the purpose of the legislature to treat them as courts of general jurisdiction. By the Poland bill they were shorn of all civil, chancery, and criminal jurisdiction, excepting in divorce proceedings. From the earliest history of the territory, these courts have exercised jurisdiction in divorce cases, and, though Congress stripped them of powers theretofore exercised, it did not deprive them of jurisdiction in this class of cases until 1887. They were courts having a seal,

clerk, and kept records of their proceedings; and the general procedure act, governing district courts, was applicable to them. Orders and writs were issued by the clerk under the seal of the court. This, we think, constituted them courts of record. *Vassault* v. *Austin*, 36 Cal. 696; *McCauley* v. *Fulton*, 44 Cal. 360; *Robinson* v. *Fair*, 128 U. S. 87, 9 Sup. Ct. 30; Van Fleet, Coll. Attack, §§ 814–827.

It is often stated that the presumptions of law are in favor of the jurisdiction and of the regular proceedings of superior courts,—of courts of general jurisdiction, proceeding according to the course of the common law; but this statement does not aid us much in determining what are courts of general jurisdiction. The term "general jurisdiction" would imply unlimited powers, but we have no courts of unlimited powers in this territory. A court of record, proceeding according to the regular ordinary course of proceeding of the territorial jurisdiction, and whose judgments may be reviewed by writs of error or appeal, is a court whose proceedings and judgments import verity, and, until reversed, will protect those obeying them. Mere special tribunals, created for some special or temporary purpose, governed by some special rule or proceeding, are not courts of record, and cannot claim such immunities for their judgments or acts. "The true line of demarcation between courts whose decisions are conclusive if not reversed and those whose proceedings are nullities if the jurisdiction does not appear of their face is this: A court which is competent by its constitution to decide on its own jurisdiction, and to exercise it to a final judgment, without setting forth in their proceedings the facts and evidence on which it is rendered, whose record is absolute verity, and not to be impugned by averment or proof to the contrary, is of the first description. There can be no judicial inspection behind the judgment save by appellate

power." *Grignon* v. *Astor*, 2 How. 341; *Borden* v. *State*, 54 Am. Dec. 221.

The probate court had the power to hear and determine the class of cases confided to it by the legislature, and it is not saying too much to aver that courts dealing with divorce proceedings and the settlement of estates of deceased persons, at least so far as their effect on property rights and social relations are concerned, are as important as any courts with which we have to deal. We think that every principle of justice dictates that the same presumption should attach to their proceedings as other courts. For the repose of titles, the security of property, and the interest of the public, a rule should be adopted which would render secure from collateral attack their proceedings. At any rate, we see no good reason why a different rule should be applied to their judgments than governs decrees of district courts. In one view, the probate court had unlimited jurisdiction over divorce cases. It is true such cases could be removed to the district court, or, after final judgment, an appeal would lie; but it had jurisdiction to render a final decree and judgment. "The word 'limited' seems to be used sometimes carelessly instead of the term 'special,' for I take the true distinction between courts to be such as possess a general and such as have only a special jurisdiction for a particular purpose, or clothed with special powers for the performance of specific duties, beyond which they have no manner of authority; and those special powers to be exercised in a summary way, either by a tribunal already existing for general purposes, or else by persons appointed or to be appointed in some definite form. Some tribunals, with special powers for adjudication in particular cases, under the various names of 'commissioners,' 'surveyors,' 'appraisers,' 'committees,' 'contractors,' 'overseers,' and the like, abound in our statute books, little or in no wise relating to the

general administration of justice whose modes of proceeding are prescribed by the statute by which they are erected; and unless their proceedings, on the face of them, show a compliance with the directions required by the statute under which they act, it never could be known whether they acted within their jurisdiction or exceeded it." *Obert* v. *Hammel,* 18 N. J. Law, 73.

Counsel for respondents concede that the probate court, at the time this decree was rendered, was a court of general jurisdiction in matters pertaining to the guardianship of minors and the administration of estates of decedents, but, as we understand his position, in dealing with divorce cases it was a court of special or limited jurisdiction. We see no good reason for holding it to be an inferior court while adjudicating questions of equally as much, if not greater, importance, while its proceedings were being conducted in conformity with the general practice prevailing in courts of superior jurisdiction. Because, by special enactment, jurisdiction is conferred upon a tribunal, it does not necessarily follow that such tribunal thereby becomes one of special or limited jurisdiction. In many of the states there has been special legislation regarding the subject of divorce. Indeed, the subject has been taken from ecclesiastical courts, and in some jurisdictions the legislatures have been prohibited from granting divorces. In other words, by special legislation the authority to determine the matrimonial status has been referred to certain courts; but, because of this character of legislation, we do not think the courts exercising the jurisdiction conferred are of special or limited jurisdiction, and the judgments rendered therein entitled to different presumptions than followed in determining other cases. The distinction is obvious between conferring jurisdiction over a new subject-matter or a class of cases, to be conducted in the manner prescribed in the ordinary course of procedure of the court, and in confer-

ring on the court special powers, to be exercised in a special manner. The case relied on so strongly by respondents seems to recognize this principle: "When the special powers conferred are brought into action according to the course of that law [common law] and chancery proceedings by regular process and personal service, where a personal judgment or decree is asked, or by seizure or attachment of the property, where a judgment *in rem* is sought, the same presumption of jurisdiction will usually attend the judgment of the court, as in cases falling within its general powers." *Galpin* v. *Page*, 18 Wall. 371.

Regarding probate courts as courts of general jurisdiction, the question that naturally suggests itself is, what presumptions attend such courts? And, first, it is to be observed that probate courts had jurisdiction to determine the matrimonial status of persons. It had jurisdiction of the subject matter. Being a court of competent jurisdiction, its judgment cannot be treated as a nullity, even though there be irregular process, until reversed; for "there is no principle better settled than that every act of a court of competent jurisdiction shall be presumed to have been rightly done until the contrary appears. This rule applies as well to any judgment or decree rendered in the various stages of their proceedings, from their initiation to their completion, as to their adjudication that the plaintiff has a right of action. Every matter adjudicated becomes a part of the record, which thenceforth proves itself, without referring to the evidence in which it has been adjudged." *Voorhees* v. *Bank*, 10 Pet. 472. The supreme court of North Carolina, in an opinion by Chief Justice Ruffin, speaking of a title, based on attachment and garnishment against an absconding debtor, says that "the general rule has not been questioned by defendant's counsel that a judgment of a court having jurisdiction of the subject-matter, and proceeding according to the course

of the common law,  *    *    *    cannot be collaterally impeached; but, until it be set aside by the same court, or reversed in a superior tribunal, is conclusive.    Such is unquestionably the rule of the law.    The reason is, the judgment itself is an evidence of the right determined in it, or debt recovered, and is evidence so high that a denial of the right can only be made in the form of an appeal denying the existence of the record alleged.    *    *    *. But we are not aware of any instance in which the subject-matter is within the jurisdiction, and a cause is once constituted in a court of record that the judgment is not conclusive between the parties, or any other plea admissible except *nul tiel* record; and that without regard to the process by which the action was commenced." *Skinner* v. *Moore,* 30 Am. Dec. 155.

After determining that the court has jurisdiction of the subject-matter, the next inquiry is, did it have jurisdiction of the person?  In collateral proceedings this question can only be determined by an inspection of the record.  If it is silent, then the presumption follows that what ought to have been done was not only done, but rightly done.  In a collateral attack, the omission to affirm the jurisdictional fact upon the record will be supplied by the presumption that the court acted with due authority, and its judgment will be as valid as though any fact necessary to jurisdiction affirmatively appeared.  But the record in this case is not silent upon this jurisdictional question.  The decree of the court recites, among other things, "that the cause came on regularly for hearing, and that it appeared to the court that said defendant was duly served with process by publication."  These findings are as conclusive upon all parties in a collateral proceeding as any adjudication of the court can be.  It must be presumed that they were supported by sufficient testimony not set forth in the record.  "Thus, though the return of the summons against

A. B. certifies a service of the summons upon C. D., and the judgment states that A. B. has been summoned, the record is not necessarily contradictory. The error in the service of process may have been corrected by service of summons on the proper persons, and, since statement to this effect is made by the court, it will be presumed that it acted upon ample evidence, and with due deliberation, before making such statement; and the judgment will be impregnable to any collateral assault." 1 Freem. Judgm. § 130. Mr. Freeman further states that a finding or a recital showing that the court had jurisdiction is, in the vast majority of the states, not disputable when a judgment based thereon is drawn in question collaterally. Accordingly, it has been held that the fact that summons served by publication omitted the name of one of the defendants, to whom property had been assessed, was not fatal to the decree, because, from the recital of due service, it was conclusively presumed that the court had sufficient proof of service, though the judgment roll failed to disclose it. *Reily* v. *Lancaster*, 39 Cal. 354; *Branson* v. *Caruthers*, 49 Cal. 375. And a recital in proceedings by an administrator to sell land that proof was made " of the service of notice according to provisions of the statute " was held sufficient against collateral attack. *Bowen* v. *Bond*, 80 Ill. 351. A recital that " due notice has been given to the defendant " cannot be contradicted in a collateral action. *Richards* v. *Skiff*, 8 Ohio St. 586. And, where a probate record of the final settlement of an administrator showed personal appearance of all the heirs by name, they were not allowed to contradict it in a collateral proceeding. *Hardy* v. *Gholson*, 26 Miss. 70; Van Fleet, Coll. Attack, § 479.

In *Brickhouse* v. *Sutton* (N. C.), 5 S. E. 380, the court says: " Every intendment is in favor of the action of the court and its sufficiency. The ascertainment and recital

of facts in the record by the court imports verity and binding effect, and must be so treated for all proper purposes of the action, till, in some proper way, the action of the court shall be successfully impeached. Thus, in this case it must be taken that the court, acting upon proper evidence, ascertained and set forth in the record the important fact that the defendants in the proceeding in question were served with process against them; that is, served regularly and effectually." And in *Goodell* v. *Starr*, 127 Ind. 200, 26 N. E. 793, the court follows the decision just referred to, and states that "the cases of *Quart* v. *Abbett* (Ind. Sup.), 1 N. E. 476 [and others cited], lay down that which we regard as the correct rule on that subject. When notice is given by publication, the judgment of the court, acting upon such notice, that the publication and the affidavit upon which it is based are sufficient to give it jurisdiction, is conclusive upon all the parties as against a collateral attack." And in the case of *Goodwin* v. *Sims* (Ala.), 5 South. 587, it is stated that "the rule deducible from these decisions is that when the court, by the recitals in the decree, ascertains the jurisdictional fact, such adjudication is final and conclusive when the decree is collaterally assailed; and, if the decree is silent, the jurisdictional fact may appear from other parts of the record. As the entire record imports absolute verity, the recitals of the decree may be explained, limited, or qualified by other parts of the record. The entire record may be looked to for the purpose of ascertaining the jurisdictional facts, when there is no finding by the court, for jurisdiction is acquired from the facts as they appear in the entire record; but when the power to ascertain the jurisdictional fact is conferred on the court, and the court adjudges that it has jurisdiction, it is not overcome or destroyed because other parts of the record may not be sufficient to uphold such finding." 1 Black,

Judgm. §§ 273, 274, 278; 1 Freem. Judgm. §§ 126, 132; *Hall* v. *Law*, 102 U. S. 464; *Adams* v. *Cowles* (Mo. Sup.), 8 S. W. 711; *Kinney* v. *Lewis*, 2 Utah, 517; *Callen* v. *Ellison*, 13 Ohio St. 454; *Shawhan* v. *Loffer*, 24 Iowa, 226; *Nash* v. *Church*, 10 Wis. 244; *Blasdel* v. *Kean*, 8 Nev. 308; *Davis* v. *Robinson*, 70 Tex. 397, 7 S. W. 749; *Waterhouse* v. *Cousins*, 40 Me. 333.

Respondents contend, however, that the recitals in the decree are contradicted by other papers appearing in the record. In order to determine what papers are a part of the record, reference must be made to the Compiled Laws of 1876. The law in question did not require the filing of the affidavit or order of publication. Section 1428 provides that, "immediately after entering the judgment, the clerk shall attach together and file the following papers, which shall constitute the judgment roll: The complaint, the summons, with the affidavit of proof of service, and a copy of the judgment." It has been held repeatedly in California that proof of service does not include the affidavit or order of publication. *Sharp* v. *Daugney*, 33 Cal. 512; *Hahn* v. *Kelley*, 34 Cal. 404; *Quivey* v. *Porter*, 37 Cal. 464. We adopted the statute just referred to from California with this construction, and will therefore follow the interpretation placed upon it by the California courts. *People* v. *Ritchie*, 42 Pac. 209, *ante*, p. 180; Suth. St. Const. § 256. By amendment, the affidavit and order of publication are now required to be made part of the judgment roll. The affidavit for publication and the order of the court issuing thereon not being a part of the judgment roll, the court will not look into the record to ascertain whether or not they were properly made or filed. Their absence from the files of the cause is immaterial, and cannot be proved to overcome the presumption of regularity. In *Hahn* v. *Kelley*, *supra*, the affidavit and order of publication were offered for the purpose of contradicting the presumption

of legal service on which judgment had been rendered, but
the court say: "So, for the purpose of determining whether
the want of jurisdiction is shown by the record, we can
only look to the summons, the affidavit of the printer, the
complaint with the default indorsed thereon, and the judg-
ment. The affidavit, made for the purpose of obtaining
an order for publication, and the order of the court direct-
ing publication, for all the purposes of the question before us,
must be disregarded, or, in other words, presumed to have
been all that the law requires." See *Harvey* v. *Tyler*, 2
Wall. 344; *Hall* v. *Law*, 102 U. S. 463; *Applegate* v. *Min-
ing Co.*, 117 U. S. 269, 6 Sup. Ct. 742; *Estate of Newman*,
75 Cal. 213, 16 Pac. 887.

We again quote from *Hahn* v. *Kelley:* "We consider the
true rule to be that legal presumptions do not come to the
aid of the record, except as to acts or facts touching which
the record is silent. Where the record is silent as to what
was done, it will be presumed that what ought to have
been done was not only done, but rightly done. If the
record merely shows that a summons was served on the
son of defendant, it will not be presumed that it was
served on defendant. If the affidavit of the printer shows
that the summons was published one month, it will not
be presumed that it was published three. To avoid any
misapprehension, we deem it proper to add that so far we
have assumed, for the purposes of the argument, that the
record, aside from that portion of it which is denominated
the 'proof of service,' is silent upon the question of service;
but it may happen that other portions of the record may
also speak upon that question. If so, what they say is not
to be disregarded. On the contrary, in determining the
question whether a want of jurisdiction is apparent upon
the face of the record, we must look to the whole of it,
and report the responses of all its parts. To illustrate:
Suppose that portion of the judgment roll denominated

the 'affidavit of proof of service' shows that personal service was made upon the son of defendant, and the remainder of the record says nothing about service; we then have a want of jurisdiction appearing upon the face of the record. But suppose the judgment states that the defendant appeared, or that personal service was made upon him, or something else that is equivalent, as it frequently does; the opposite result follows, for the record cannot lie, and it appears that the father as well as the son had been served, which may well have been the case.    *    *    * So in a case of a service by publication, if the affidavit of the printer states that the summons was published one month, and yet the court, in its judgment, states that it was published three, or that service has been had upon defendant, it will be presumed that other proof than that contained in the judgment roll was made, for not to so presume would be to deny to the record that absolute verity which must be accorded to it."

We think that the court having found, judicially, that service was legally made upon the defendant Butterworth, in this collateral proceeding recourse could not be had to the files in the case, aside from the judgment roll, and that no evidence would be admissible other than that contained in the judgment roll *dehors* the recital in the judgment. The question then arises, is there anything in the affidavit of publication contradictory of the recitals in the decree? We think not. The affidavit of service is rather one of posting. All that is there stated is entirely consistent with the recitals in the judgment. The affiant may have mailed the papers as stated in the affidavit; but his affidavit does not disprove the idea that the publication was made four times consecutively, or that the first insertion was at least 40 days prior to the date for answer. The affidavit is not proof that the only publication was as stated therein. There may have been other affidavits show-

ing publication in four consecutive issues of the paper, and that the first publication was at least 40 days before the time for answer. This affidavit is silent upon these points; and as stated in the opinion from which we have just quoted, if the affidavit of the printer states that the summons was published one month, and yet the court in its judgment, states that it was published three, it will be presumed that proof other than that contained in the judgment roll was made. Indeed, from the testimony of Butterworth, it is quite apparent that the affidavit did not contain a statement of all that did actually occur with reference to the publication of the summons.

We think there was nothing in the judgment roll contradicting the recitals in the judgment, and that the absence of the order of the court for publication in no manner vitiated the decree rendered in the case; and it is to be noted here that, notwithstanding the certificate of the clerk that the papers above referred to were the only ones filed in the cause, there was nothing requiring the filing of the order of publication, and the certificate is not incompatible with the presumption of the existence of such order, duly made by the court. The case of *Coit* v. *Haven*, 30 Conn. 195, is instructive upon this question. Service was constructive, as appeared from the return of the officer, the writ having been left at defendant's house. The language of the judgment was: "This action came to the present term of this court." The parties against whom it was presented, in opposition to the record, for the purpose of showing that the judgment was void, offered to prove by defendant in the judgment and others that at the time when the copy of the writ was left in service by the officer, as claimed, at his usual place of abode, he was not an inhabitant of the town or of any place in the state, and that the writ never was in any way served; and that, at the time it was claimed to have been served, he was

residing out of the state.    This testimony was rejected.

The court say:    "But counsel for defendant urged the extreme hardship to which a party may be subjected if he may not deny and disprove the service of the writ, when he can clearly show in fact no service was ever made on him, and that he never had notice of the suit in any form, and never heard of the judgment against him until it was made the ground of an action."    They say with great emphasis, and the argument is certainly a forcible one:    "Can it be that the clerk of the court may fabricate a record, or an officer make a false return of service, and yet there be no escape for one who is thus, by a judgment in a suit, made heavily indebted or found guilty of a wrong, when in fact he is perfectly innocent, and never owed the debt, and could show it clearly if he had a chance?    *    *    *    It is so necessary that confidence should be reposed in courts of a high character, as well as the records of such courts, that on the whole, and in view of all the considerations affecting the subject it is the only safe rule to give the decisions of courts of general jurisdiction full effect so long as they remain in force, rather than to leave them open to attack in every way and on all occasions.    Being domestic judgments, they can, if erroneous, be reviewed by proceedings instituted directly for the purpose, and reversed on error or by new trial; and, if the danger is imminent and special, relief can be temporarily, if not finally, obtained by application to a court of equity.    *    *    *    Any other rule with regard to judgments of such courts would be attended with great embarrassment, and would be very dangerous in its general operation.    The general good clearly requires, and has therefore established the rule, that domestic judgments of courts of general jurisdiction cannot be attacked collaterally."

In Illinois it was held that where a decree recited due.

and legal process had been made, and the process found
in the record was issued three terms before, and showed
a defective service, it was presumed that another process
had been issued and served, as the time had been sufficient
within which to do it.   *Mulvey* v. *Gibbons*, 87 Ill. 367.
And in another case, where the summons found among the
papers was returnable at the July term, upon which the
service was too short, the court held that that would not
control a recital of service made at the August term, as
the presumption was that a new writ had been issued, and
duly served.   *Matthews* v. *Hoff*, 113 Ill. 95.   The affidavit
for publication is in the nature of evidence, and its suffi-
ciency cannot be questioned in a collateral proceeding.
*Banta* v. *Wood*, 32 Iowa, 469.   From the service of process
the court has jurisdiction, and, because of some irregularity
or defect in the service, ordinarily the judgment would
not be void.   In the case of *Sargent* v. *Bank*, 12 How.
378, a paper was found in the files purporting to show
how notice was given of service of process, and which was
contradictory of the recital in the judgment.   It was held
to be no part of the record, and could not be received to
impeach its verity.   The court there say: "The real
record informs us that legal and sufficient notice was given
to the heirs of Samuel Sargent, but whether by this paper
or by what other mode, except that it was legal and suffi-
cient, we are not told, and are not at liberty in this case
to indulge in inferences against the verity of the record.
It is a principle well settled, too, in judicial proceedings,
that, whatever may be the powers of a superior court in
the exercise of regular appellate jurisdiction to examine
the acts of an inferior court, the proceedings of a court of
general and competent jurisdiction cannot be properly im-
peached and re-examined collaterally by a distinct tribunal,
one not acting in the course of appellate power.   To
permit the converse of this principle is to unsettle nine-

tenths of the rights and titles in any community, and lead to infinite confusion and wrong." In line with the expressions in *Hahn* v. *Kelley*, it was held that when the statute provided that the affidavit of the printer or publisher "shall be sufficient evidence of publication," and the certificate of the publisher was not verified, the statute did not make the affidavit exclusive proof of service, and that, as the record contained a recital of due proof of service, the presumption was that other proof was given. *Raley* v. *Guinn*, 76 Mo. 263; *Sargeant* v. *Bank*, 4 McLean, 339, Fed. Cas. No. 12,360; Van Fleet, Coll. Attack. §§ 835, 836.

We do not mean in this opinion to decide what defects in service would, in a collateral proceeding, be sufficient to overthrow the presumption of verity. Reference has been made more or less to authorities opposite to the general question, but the conclusions which we reach are based on the facts of this particular case and the equities presented for our consideration.

Respondents also contend that, no matter what presumptions of regularity attend a judgment, if it appears that it was taken against a nonresident the presumption ceases. In support of this view, *Galpin* v. *Page*, 18 Wall. 365, is cited. It must be remembered that in that case there was no recital of due service of process, and the decree introduced had been reversed by the supreme court of California, upon the ground that service was insufficient to give jurisdiction; also, the decree was introduced in a federal court as a basis for relief, the granting of which, under all the circumstances, would have been inequitable and unjust. It seems from a careful reading of the case that the decree would still have been held good as to the rights of third parties having equitable interests; and that the court regarded it, at least for some purposes, as merely voidable. Even if it should be conceded that, the fact of

nonresidence being apparent upon the record, the presumption of verity does not attach, could it not with propriety be argued that this presumption would be reinstated and entitled to its legal effect by the solemn adjudication in the decree that due service had been made? It would seem there must be a distinction between cases where the judgment is silent about service and one where it directly affirms the service as a jurisdictional fact. Many of the cases cited in respondents' brief in support of this contention, present wholly different features from those existing in the case at bar. In the case of *Thompson* v. *Whitman*, 18 Wall. 457, a judgment which had been rendered in a special proceeding, as well as in a foreign suit, was under consideration. In the case of *Noble* v. *Railroad Co.*, 147 U. S. 173, 13 Sup. Ct. 271, the question before the court was one of presumptions merely, and not the effect of recitals in the decree; and the case of *Romaine* v. *Insurance Co.*, 28 Fed. 625, does not present the question of collateral attack. *Cissell* v. *Pulaski Co.*, 10 Fed. 893, involved the question of a judgment rendered in a special proceeding.

In the case at bar the validity of a domestic judgment is involved, and the question of special proceedings is not presented. In saying this we are not unmindful of the fourteenth amendment to the constitution, and the construction that has been placed upon it. Jurisdiction can be obtained by constructive service, and the judgment rendered is " due process of law." The state is sovereign. It has a right to provide for bringing into its courts those whose rights are involved or for the effectual adjudication of the rights of others whose appearance may be necessary. It has the right to provide tribunals to determine the matrimonial status of persons domiciled within its limits, and such a determination is a judgment *in rem*. Of course, a personal judgment cannot be rendered against

a nonresident without personal service.    *Pennoyer* v. *Neff*,
95 U. S. 714.    Why, in a collateral proceeding, a court
should attach greater inviolability to a domestic judgment
rendered against a resident than one obtained against a
nonresident, is difficult to understand.    In passing upon
the questions before it, its proceedings are in the same
general manner and according to the same general prac-
tice. . In one case its judgments import verity.    According
to many authorities in the other case, its judgments are
subject to collateral impeachment, and no presumptions
of verity attend them.    It seems folly to predicate this
distinction upon the assertion that constructive service
was unknown to the common law.    Conceding this to be
true, what follows?    Our courts are creatures of statute.
Their powers and their proceedings are largely determined
by legislative enactment.    Service of summons upon resi-
dents is provided for by statute.    Perhaps no greater
power was conferred upon the courts by these enactments,
but a different mode of exercising an old and inherent
power was pointed out.    It seems to the writer of this
opinion that *Galpin* v. *Page* is founded upon the fallacy
that constructive service is in derogation of some venerated
principle, and to be regarded with disfavor.    The growth
of civilization, the development of commerce, the estab-
lishment of business relations, the homogeneousness of the
people of our sister states, seem rather to commend this
practice of obtaining jurisdiction of the person, because
of the necessities that arise, and the great inconvenience,
not to say embarrassments, that would result if jurisdic-
tion could only be obtained by personal service.    Con-
structive notice was well known both to common law and
chancery practice, and it is therefore a proceeding "accord-
ing to the course of the common law."    3 Bl. Comm.

283, 444; 1 Freem. Judgm. § 127; *Hahn* v. *Kelley*, 34 Cal. 417.

Why, on principle, two judgments in the same court of general jurisdiction, in due form, should be entitled to different presumptions respecting the verity of the record, simply because one is against a nonresident, where the proceeding is *in rem*, is a question the proper solution of which no court has successfully attempted. Mr. Freeman says that "the tendency of modern decisions is to strengthen the position that the orders and proceedings of courts of general jurisdiction, where process is constructively served, are supported by the same presumptions as when the court proceeds upon personal service, and can no more be avoided for mere errors and irregularities than can its other orders and judgments." 1 Freem. Judgm. § 127. See *Fanning* v. *Krappfi*, 68 Iowa, 244, 26 N. W. 133; *Dowell* v. *Lahr*, 97 Ind. 146; *Quarl* v. *Abbett*, 102 Ind. 233, 1 N. E. 476; *Williams* v. *Moorehead*, 33 Kan. 609, 7 Pac. 266; *Williams* v. *Hudson*, 93 Mo. 524, 6 S. W. 261; *Stewart* v. *Anderson*, 70 Tex. 588, 8 S. W. 295; *Adams* v. *Cowles*, 95 Mo. 501, 8 S. W. 711. "The authorities upon this side of the question have apparently received an unexpected accession from the Supreme Court of the United States. From the language employed by that tribunal, we understood it to be firmly committed to the doctrine that, when it appeared that defendant was served with process by publication, no jurisdictional presumption could be indulged in, in favor of the judgment; but this language is now limited in its application to cases in which it does not appear that the court made any order justifying such publication.   *   *   *   On the other hand, if it is shown that the court ordered such service, its judgments are supported by the same presumption as in other cases, unless the statute requires that

evidence of such jurisdictional fact shall appear by record, and it does not so appear. If it [this decision] means that, except as to matters which the statute has expressly required to be a part of the judgment or judgment roll, the court must always presume that jurisdiction was obtained where the record does not rebut such presumption, then this decision is an important aid to the ultimate establishment of the rule that judgments of courts based upon constructive service of process are supported by the same presumptions as if such service were personal." 1 Freem. Judgm. § 127; *Applegate* v. *Mining Co.*, 117 U. S. 255, 6 Sup. Ct. 742.

It would seem that the decision in the case of *Applegate* v. *Mining Co.*, *supra* (especially in view of what was said in the case of *Sargeant* v. *Bank*, 12 How. 371, that no papers could be looked to in order to determine the sufficiency of publication but such as by statute constituted the judgment roll), clearly announced the rule that the court will presume jurisdiction was obtained over the defendant where the judgment roll does not rebut that presumption. In *Applegate* v. *Mining Co.*, the statute under which the proceeding resulting in the judgment in question had been conducted authorized the court to appoint a day for the absent defendants to enter their appearance in the suit, and required a copy of its order to be published "in the Kentucky Gazette or Herald, and continue for two months successively, and shall also be published on some Sunday immediately after divine service in such church or meeting house, as the court shall direct, and another copy shall be posted at the front door of said courthouse." In support of the judgment, extrinsic evidence was offered of the publication of the order in the Kentucky Gazette in nine successive weekly issues of that paper, but there was no evidence of the publication of the order in church, or its posting at the front door of the

courthouse. The court said: "But the record contained no proof of publication and posting notice, as required by statute; and it is insisted by the defendants in this case that the record itself must show the publication and posting notice as required by law, otherwise the jurisdiction of the court does not appear, and its decree is absolutely void. While it must be conceded that, in order to give the court jurisdiction over the persons of the defendants, all the steps pointed out by the statute to effect constructive service on nonresidents were necessary; yet it does not follow that evidence that the steps were taken must appear in the record, unless, indeed, the statute expressly or by implication requires it. The court which made a decree in the case of *Clark* v. *Conklin* was a court of general jurisdiction. Therefore every presumption not inconsistent with the record is to be indulged in, in favor of its jurisdiction. * * * It is to be presumed that the court, before making this decree, took care to see that its orders for constructive service, on which its right to make the decree depended, had been obeyed. That this presumption is authorized will clearly appear by the following cases:

In *Harvey* v. *Tyler*, 2 Wall. 328, the court stated: 'The jurisdiction which is now exercised by the common-law courts in this country is, in a very large proportion, dependent upon special statutes conferring it. * * * In all cases where the new powers thus conferred are to be brought into action in the usual form of common law or chancery proceedings, we apprehend there can be little doubt that the same presumptions as to the jurisdiction of the court and the conclusiveness of its action will be made as in cases falling more strictly within the usual powers of the court.' In *Hall* v. *Law, supra,* the validity of the partition of lands made by a circuit court of the state of Indiana was attacked. This court said: 'All that the statute designates as necessary to authorize the

court to act is that there should be an application for a partition by one or more adjoining proprietors, after giving notice of the intended application in a public newspaper for at least four weeks. When application is made, the court must consider whether it is by a proper party, whether it is sufficient in form and substance, and whether the requisite notice has been given as prescribed. Its order made thereon is an adjudication on these matters.' The case of *Voorhees* v. *Bank,* 10 Pet. 449, was an action of ejectment, and the case turned on the validity of a sale of the premises in controversy, under a judgment of the court of common pleas of Hamilton county, Ohio, in a case of foreign attachment. The sale was attacked on the following among other grounds: (1) Because the statute authorizing the proceeding by foreign attachment required that an affinavit should be made and filed by the clerk before the writ issued, and no affidavit was found in the record; (2) because the statute directed three months' notice to be given by publication in a newspaper of the issuing of the attachment before judgment should be entered, and also required 15 days' notice of the sale to be given, neither of which appeared by the record to have been done; (3) because the statute required that the defendant should be put in default at each of the three terms preceding the judgment, and the default entered of record, but no entry was made of the default at the last of the three terms. But the court overruled the objections, and sustained the validity of the judgment and the sale. It said: 'But the provisions of the law do not prescribe what shall be deemed evidence that such acts have been done, or direct that their performance shall appear on the record. * * * This leaves the question open to the application of those general principles of law by which the validity of sales made under judicial process must be tested, in the ascertainment of which we do not

think it necessary to examine the record in the attachment for evidence that the acts alleged to have been omitted appear therein to have been done.'"

The court announces, as a result of these opinions, that "where a court of general jurisdiction is authorized in a proceeding, either statutory or at law or in equity, to bring in, by publication or other substituted service, nonresident defendants interested in or having a lien upon the property lying within its territorial jurisdiction, but is not required to place proof of service upon the record, and the court orders such substitutive service, it will be presumed, in favor of the jurisdiction, that service was made as ordered, although no evidence thereof appears of record, and the judgment of the court, so far as it affects such property, will be valid." See *Grignon* v. *Astor*, 2 How. 319; *Lessee of Boswell* v. *Sharp*, 15 Ohio, 447; Van Fleet, Coll. Attack, §§ 388–396, 834; *Essig* v. *Lower* (Ind. Sup.), 21 N. E. 1090.

From these authorities it would seem that judgments rendered against nonresidents were entitled to the same presumptions as in cases of personal service. The case of *Galpin* v. *Page* seems to be at variance with the cases just cited, and has been substantially overruled, although this is denied by the court in the case of *Applegate* v. *Mining Co.* The rule announced in the case just cited and in *Hahn* v. *Kelley* is, we think, for the best interest of the public generally, and essential for the security and repose of titles to property as well as personal rights. Accordingly, we are of the opinion (*a*) that the affidavit upon application for order of publication, and the order based thereon, under the Compiled Laws of 1876, are not a part of the record, and their existence or nonexistence cannot be appealed to in this collateral attack to impeach the verity of the record; (*b*) that, the recital of service of process not being contradicted by anything appearing in

the judgment roll, the presumption is that the court acquired jurisdiction of the defendant, and in this collateral proceeding the decree of divorce there rendered is unassailable and conclusive.

In reaching these conclusions we have in mind the rule that collateral assaults upon judgments are not favored unless it clearly appears that the court had no jurisdiction or transcended the same, and especially when the equities are upon the side of the party attempting to uphold the validity of the decree. *Head* v. *Daniels,* 38 Kan. 12, 15 Pac. 911; *Gemmell* v. *Rice,* 13 Minn. 406 (Gil. 371); *Ogden* v. *Walters,* 12 Kan. 235.

Plaintiff was an actual and *bona fide* resident of the territory. The marriage between her and Elliott Butterworth, by reason of his nonresidence, had ceased to be of any practical effect. The court had authority to determine the status of the plaintiff. It was a proceeding *in rem.* No property rights or children were concerned, and no personal judgment was prayed for. Notice to the defendant was not a natural right, but he was entitled to it only by reason of the statute. *Borden* v. *State, supra.* He received notice of the proceedings. If process was irregular or the notice defective, he could have appeared and contested the proceedings. Even if the judgment were erroneous, it is invulnerable in this attack. *Pettiford* v. *Zoellner,* 45 Mich. 362, 8 N. W. 57; *Estate of Newman,* 75 Cal. 220, 16 Pac. 887. He was not misled or prejudiced. He regarded the decree as valid, and contracted new relations. The plaintiff, in good faith, married the deceased. Both accepted the decree of the court as valid. Neither one could question its validity. They had acquiesced in it, and had validated it, even if it were invalid. *Crosby* v. *Probate Court,* 3 Utah, 52, 5 Pac. 552; *Pettiford* v. *Zoellner, supra; Colton* v. *Rupert,* 60 Mich. 329, 27 N. W. 520; *Hendrick* v. *Whittemore,* 105 Mass. 26; *Arthur* v.

*Israel,* 15 Colo. 147, 25 Pac. 81. After so great a lapse of time, and in view of the new relations contracted since, the court ought to indulge in any reasonable presumption that would give validity to the decree, and determine that the parties were duly separated, and the new relations were not criminal and meretricious. *Wilson* v. *Holt,* 83 Ala. 540, 3 South. 321; 1 Bish. Mar., Div. & Sep. §§ 77, 956–958, 1148, 1149; *Carroll* v. *Carroll,* 20 Tex. 741.

Sound reasons of public policy would dictate the upholding of the decree where there have been subsequent marriages, children born, and property acquired; especially when the court had jurisdiction of the subject-matter, and when the only contention is that process was defective, though defendant had actual notice of the proceedings, and was not prejudiced in any manner. If neither can question the validity of the decree, if both are estopped, what principle of justice in the case would permit third parties to do so? This case was tried in a court of equity. We cannot see why, when the defendant is not complaining of any wrong done, and when, in fact, no wrong was done and no fraud perpetrated in procuring the divorce, and he had full knowledge of the proceedings, some third party, in a collateral proceeding, can question the judgment because of defective process. It is a matter of common knowledge that in many of the proceedings of probate courts of this territory there have been informalities, and perhaps serious irregularities, but for years their adjudications have been acted upon, and property rights have been acquired. Hundreds of divorces have been granted, and new relations have been entered into. If we were to declare this decree invalid, it would bastardize many children, disrupt families, unsettle titles, and bring litigation and trouble to many homes. We think, in addition to the reasons heretofore assigned for upholding this decree,

the ones just suggested are entitled to consideration, and add strength to the conclusions just reached.

2. To determine who are the heirs of the decedent, it becomes necessary to ascertain the ancestor from whom the estate came. Royal D. Amy. *et al.* contend that the estate descended from Dustin Amy, father of decedent; while the other parties to this controversy assert that it was originally acquired and owned by the mother of the decedent. On the trial, counsel for Adelia Young *et al.*, offered the declaratory statement of decedent's mother, dated January 8, 1872, directed to the probate judge of Salt Lake county, by which she claimed to be the owner and occupant of the premises in controversy, and petitioned to be adjudged the occupant and owner thereof; also, an order of the probate judge citing all persons interested in said property to appear, and the order of the court, which it seems was not signed, reciting that "the case duly came on for hearing, upon the application of the party; and upon investigation thereof, the evidence adduced, the affidavit herein filed, and the allegations of the parties, the court is of the opinion, and it is so ordered and adjudged, that the said Lavira C. Smith [Amy] is the original owner of [then follows a description of the premises in controversy]; and it is further ordered that certificate of title issue in accordance therewith." Counsel for Royal D. Amy *et al.* objected to its admission, for the reason that it was not signed by the probate judge, and for the further reason that it does not contain a finding on the evidence offered in respect to the claim of decedent's mother for the premises in question, and that the record is not complete. Objection was overruled. Thereupon a deed from Daniel H. Wells, mayor of Salt Lake City, to Lavira C. Smith-Amy, dated April 28, 1873, was offered in evidence and received, over the objection of Royal D. Amy *et al.* Counsel for Royal D. Amy *et al.*

then offered in evidence what purported to be a copy of a deed dated September 16, 1863, executed by Dustin Amy to his wife, decedent's mother, which contained the clause: "Unto the said Lavira Smith, during her natural life, and after her decease to be and become the property of Oscar A. Smith [the deceased], son of said Lavira Smith, the said property being the same that said Dustin Amy received in trade from Claud Clyde," etc. They also offered the deposition of Royal D. Amy to prove that the deed was delivered to decedent's mother, and they claim that the property was held by Mrs. Amy as trustee for the decedent, and that the property was never owned by her, but descended to decedent from his father.

We do not agree with counsel in this position. At the time of the alleged deed, executed by Dustin Amy, he had no interest in the property which could be charged with a future estate. He could do nothing more than transfer possession by any instrument which he might execute. *Buxton* v. *Traver,* 130 U. S. 235, 9 Sup. Ct. 509. In the case of *Whittemore* v. *Cope,* 40 Pac. 256, it was claimed that, because the property was the homestead of the deceased, his wife (who continued to reside thereon) could not hold it adversely, and that she held only a life interest therein. The court, speaking of this claim, say: "In 1868 the land laws of the United States were extended over Utah, and the mayor's entry was made in November, 1871. * * * Thomas Cope, deceased, had no estate whatever in said lot, not even an inchoate right. He could not devise it and give title, and it would not pass to his heirs. No interest that he possessed could be the foundation upon which to predicate a homestead title, and out of his naked possession no estates in life or remainder could be carved." The case of *Drake* v. *Reggel,* 37 Pac. 583, we think, is decisive on this question. In that case George Cronyn executed to his daughter a deed of the

premises in controversy in 1865, conveying a life estate to
her, with remainder in fee to such of her heirs as she
might appoint.  The court, speaking to the question, say:

"At the time of the execution of the Cronyn deed, the
grantor had no other right or title to the land than a
simple possession.  The land was public land of the United
States, and no statute then provided for its sale.  *  *  *
The town-site act under which title was obtained was
enacted March 7, 1867, and the act of the territorial leg-
islature prescribing the necessary regulations thereunder
was passed February 17, 1869.  *  *  *  The second
section enacts that, within thirty days after the entry of
the town site by the corporate authorities, they shall give
a prescribed public notice thereof.  Section 3 prescribes
that, 'within six months after the first publication of such
notice, each and every person  *  *  *  claiming to
be the title owner, or possessor, occupant or occupants, or
to be entitled to the occupancy or possession of such land,
*  *  *  shall file a statement in writing with the
probate court of the county, containing a description of
the land claimed, and the specific right claimed therein.
*  *  *  That all persons failing to make and deliver
such statement within the time limited in this section,
shall be forever barred from the right of claiming or
recovering such land or any interest or estate therein, or
any part, parcel or share thereof in any court of law or
equity.'  *  *  *  On March 26, 1872, Lizzie D.
Wilson filed with the clerk of the probate court of Salt
Lake county her statement describing said premises, but
alleges that she is entitled to a life estate in the said piece
or parcel of land, remainder to her lawful heirs, and prays
that a fee-simple deed may issue to her; and further
referring to the Cronyn deed and the book and date of its
record as a source of her right.  *  *  *  The probate

court adjudged Lizzie D. Wilson to be the lawful owner
of possession of the said premises, and to be entitled to a
deed thereof in fee simple. * * * But it is con-
tended that Lizzie D. Wilson, being, as claimed, entitled
to a life interest, stood in the relation of trust towards
those entitled in remainder, and that the trustee having,
by a breach of duty, acquired the title, equity will hold
her as trustee for the remainder-men, notwithstanding
their failure to file the required statement; in other words,
that, although the statute attempts to bar any one so fail-
ing from thereafter claiming any estate in any court of law
or equity, there is one particular estate which such per-
son can still claim in a court of equity. We find nothing
in the statute to warrant this conclusion. In referring to
a similar statute of the territory of Colorado, the supreme
court of the United States said: 'No language could be
more explicit to make the failure to deliver the statement
within the time specified a bar—an absolute bar—to the
recovery of the same, however strong might be the equita-
ble claim to the land so lost.' *Cofield* v. *McClelland*, 16
Wall. 335. * * * In any event, the legislature
did not see fit to exempt trustees from the benefit of the
statute, nor the owners of equitable estate from its bar;
and the duty of the court is to declare the law, and not
to make it. * * * Appellants, having failed to file
the required statement, are precluded from recovering any
estate in the premises created by the Cronyn deed, and
adverse to the fee-simple estate conveyed to Lizzie D.
Wilson by the mayor of Salt Lake City."

It was the duty of the probate judge to ascertain the
question of occupancy, and his adjudication and the deed
issued to decedent's mother by the mayor of Salt Lake
City are conclusive in this collateral attack. *Ming* v.
*Foote* (Mont.) 23 Pac. 515; *Smelting Co.* v. *Kemp*, 104

U. S. 647; *Rogers* v. *Thompson*, 9 Utah, 47, 33 Pac. 234; *Society* v. *Dalles*, 107 U. S. 336, 2 Sup. Ct. 672; *Baker* v. *Brickell* (Cal.), 25 Pac. 492.

Whether or not a trust arose in favor of decedent by the deed from Dustin Amy it is not necessary for us to determine, but, under the authorities above referred to, it is clear the legal title to the premises passed to Lavira Amy by the mayor's deed, and that she is to be regarded as the person who first brought the property into the family. But, if it is admitted that Dustin Amy had an equitable interest in the premises, upon the death of Lavira Amy the legal estate descended to her heirs; and, where the legal and equitable estate in the same land become vested in the same person, the equitable will merge in the legal estate. *Whyte* v. *Arthur*, 17 N. J. Eq. 523; 1 Perry, Trusts, § 347. In the case of *Nicholson* v. *Halsey*, 1 Johns. Ch. 420, it was held that the equitable estate inherited from one ancestor merged in the legal estate inherited from the other ancestor, and did not open or separate at the death of the heir, and that the course of descent of the property which had been so inherited is to be determined by legal title. See *Patterson* v. *Lamson*, 45 Ohio St. 90, 12 N. E. 531; *Shepard* v. *Taylor* (R. I.), 3 Atl. 383.

3. Having determined that the land in question was originally owned by the mother of Oscar A. Amy, and passed by descent to decedent and Lavira C. Smith, the question then arises, who are the heirs of the deceased? The statute of succession provides that, if " the decedent leaves no issue, the estate goes one-half to the surviving husband or wife, and the other to the decedent's mother and father in equal shares, and if either be dead the whole of said half goes to the other. If there be no father or mother, then one-half goes in equal shares to the brothers and sisters of the decedent, and to the children of any

deceased person by right of representation. If the decedent leave no issue, nor husband nor wife, the estate must go to his father and mother in equal degrees, or if either be dead then to the other. *   *   * If the decedent leave a surviving husband or wife, and neither issue, father, mother, brother, or sister, the whole estate goes to the surviving husband or wife." 2 Comp. Laws Utah, p. 123. Section 2749 in the same act is as follows: "Kindred of the half blood inherit equally with those of the whole blood in the same degree, unless the inheritance come to the intestate by descent, devise, or gift of some one of his ancestors, in which case all those who are not of the blood of such ancestor must be excluded from such inheritance."

Appellants Royal D. Amy *et al.* claim that the statute has abolished the rule prevailing at common law, viz., that half blood could not inherit, and that, though they are the half brothers and sisters of the deceased, they are heirs to his estate, and inherit the entire property, unless Jennie Amy shall be considered his lawful wife, in which event they will be entitled to one-half. It is clear that, unless the section last referred to is a modification or limitation of the preceding facts, their position is correct. Subdivisions 5, 6, 7, and 8 of section 2741 would indicate that it was the purpose of the legislature to hold the property in the family of the propositus; and section 2756, which enacts that if no issue be left by the deceased, nor husband, nor wife, and the mother be living, the estate goes to the mother, and if the estate came to him as an advancement from his father and he be living, such estate goes to the father, seems to look to the same result. In answer to section 2749, it is claimed that it can have no application except in cases of next of kin of the half blood and the whole blood in equal degree; that is, if the claimant be within any of the classes expressly preferred, viz., either wife, child, parent, brother, or sister, this simple

fact of near relationship to the deceased is by the statute made sufficient, without inquiring as to blood, or the source from which the estate came. We cannot agree with counsel in the views so learnedly put forth by them nor with the decisions cited by them from 21 Mich. 229 (*Ryan* v. *Andrews*); 32 Mich. 70 (*Rowley* v. *Stray*); and 43 Wis. 167 (*Kirkendall's Estate*). The statute is clear and unambiguous, and means precisely what the words import,— that kindred of the half blood are excluded from inheriting property that descended from a line in which they are not related. The word "ancestor," as used in this connection, is construed to mean the last possessor before the decedent; that is, the person from whom the land immediately descends to the decedent. The propositus of Oscar A. Amy and Lavira C. Smith was their mother, and, upon the death of Lavira C. Smith, her estate was inherited by the decedent herein. The estate in question "came by descent to the intestate," Oscar A. Amy, from his ancestors, Lavira C. Amy and Lavira C. Smith. *Gardner* v. *Collins*, 2 Pet. 89; *Cutter* v. *Waddingham*, 22 Mo. 264; *Valentine* v. *Wetherill*, 31 Barb. 660; *West* v. *Williams*, 15 Ark. 693; *Wheeler* v. *Clutterbuck*, 52 N. Y. 70; *White* v. *White*, 19 Ohio St. 534; note to *Prescott* v. *Carr*, 61 Am. Dec. 660.

Before Royal D. Amy *et al.* can inherit any portion of the estate of the decedent, they must trace their blood to the propositus through whom decedent inherited the property. They cannot connect themselves in this manner with the mother of Oscar A. Amy, from whom he inherited an undivided one-half; neither can they trace their blood to his half-sister, from whom he inherited the remaining half. *Perkins* v. *Simonds*, 28 Wis. 90; *Kelly's Heirs* v. *McGuire*, 15 Ark. 588; *Den* v. *Searing*, 8 N. J. Law, 347; *Deadrick* v. *Armour*, 10 Humph. 599. The provisions of the statute under which brothers and sisters may inherit

are to be construed with reference to the section precluding kindred of the half blood from inheriting estates descending from the ancestor of the decedent. *Kelly's Heirs* v. *McGuire, supra.* In the cases above cited, and particularly *Kelly's Heirs* v. *McGuire* and *Cutter* v. *Waddingham,* this question has been so exhaustively discussed, and statutes similar to ours construed, that we feel it would be a superfluous task to elaborate what we have said. The overwhelming weight of authority is against the views of the Michigan and Wisconsin courts, and we see no reason for departing from the rule so well-nigh universal. The statute of succession was passed in 1884, and the legislature had, presumedly, before it the almost unbroken line of authorities' sustaining the construction against which appellants contend. To the legislature must be committed the labor of changing the statute, if change is desirable. Under our view of the statute, Jennie Amy is the sole heir of her husband.

The judgment of the lower court is reversed, and the cause remanded, with directions to enter a decree in favor of the appellant Jennie Amy, awarding her the entire estate of the decedent.

BARTCH, J., concurs.